713 A.2d 1096

MHF HOLDING COMPANY, ET AL., PLAINTIFFS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANT.

Superior Court of New Jersey
Law Division
Essex County

Decided October 12, 1997.

*Kenneth K. Lehn* for plaintiffs (*Franzblau & Dratch* attorneys).

*Howard Geduldig* for defendant (*Peter Verniero*, Attorney General of New Jersey attorney).

EDITH K. PAYNE, J.S.C.

## AMENDED OPINION

In 1967, plaintiffs purchased property adjacent to Eisenhower Parkway in the Township of Livingston, currently known on Livingston's tax map as Block 5900, Lot 42, paying approximately $27,000 for the land. At the time of purchase, the property was zoned R–2, which permitted the construction of single-family, detached residences with a minimum lot size of 25,000 square feet. In 1984, in settlement of *Mt. Laurel II* litigation, Livingston agreed to rezone the parcel from R–2 to PB–2, thereby permitting construction of a professional office building of no more than 120,000 square feet. Residential and industrial uses, as well as wholesale and retail businesses, were prohibited in the zone, which had a minimum lot size of nine acres. The settlement also provided for a property exchange that resulted in an increase in plaintiffs' highway frontage, a transfer to Livingston of property fronting on Old Road, and a prohibition of vehicle access to the property from Old Road. The resulting property consisted of 9.67 acres.

On July 29, 1986, plaintiffs applied to the U.S. Army Corps of Engineers for a wetlands delineation confirmation and confirmation of a nationwide general permit to fill a stream on the property in order to create two stream crossings. The application was granted by letter dated March 12, 1987.

Approximately four and one-half months later, on July 1, 1987, the New Jersey Freshwater Wetlands Protection Act (FWPA),

*N.J.S.A.* 13:9B–1 to 30 was enacted. The FWPA had an effective date of July 1, 1988.[1]

Despite the regulatory threat created by the FWPA, by contract dated November 4, 1988, plaintiffs agreed to sell the property to JAMM Realty Corp. for approximately $1.7 million. The sale was conditioned upon obtaining governmental approvals within 36 months for the construction of at least a 60,000–square foot office building.

On February 21, 1989, preliminary and final site plan approval was granted to JAMM by the Livingston Township Planning Board for a three-story 68,750–square foot office building, subject to the approval of the Essex County Planning Board, which was granted on September 17, 1990. Additionally, on April 10, 1989, the NJDEP issued a stream encroachment permit for the property, effective May 6, 1989 to December 31, 1996, that authorized the placement of fill and construction of three storm water outfall structures in connection with any future approval of the office building construction.

For unstated reasons, in September 1993, JAMM exercised its right, under extensions of the 36–month contractual deadline, to terminate its purchase contract. A subsequent purchase option contract with Sts. Constantine and Helen Greek Orthodox Church was terminated on February 17, 1994.

On March 3, 1994, plaintiffs were notified by the NJDEP that it was administering the Federal Clean Water Act, and under that Act, a wetlands permit was required prior to development of the property. On May 10, 1994, the NJDEP issued a Letter Of Interpretation confirming the existence of freshwater wetlands of intermediate resource value and associated transition areas on the property, and on September 22, 1995, the NJDEP issued a Letter of Interpretation confirming the delineation of those wetlands and transition areas by plaintiffs' consultants, Schoor DePalma, Inc.,

---

[1] The transition area provisions of the FWPA became effective one year later.

and again finding the wetlands to be of intermediate resource value. The September letter continued:

The wetlands have also been identified as being priority wetlands by the U.S. Environmental Protection Agency. This classification may affect the requirements for a Individual Wetlands Permit (see N.J.A.C. 7:7A–3), the types of Statewide General Permits available for the wetlands portions of this property (see N.J.A.C. 7:7A–9) and the modification available through a transition area waiver (see N.J.A.C. 7:7a–7). Please refer to the Freshwater Wetlands Protection Act (N.J.S.A. 12:9B–1 *et seq.*) and implementing rules for additional information.

The Schoor DePalma map reveals that approximately 91% of the property consists of a stream, wetlands and a 50–foot buffer or transition zone. Only 0.8 acres, consisting of three areas of 0.6 acres, 0.15 acres and .05 acres, respectively, are unaffected by the FWPA wetlands and transition zone designations. None, according to plaintiffs, is independently developable.

As a preliminary step to application for the Independent Freshwater Wetlands Permit designed to provide relief from wetlands restrictions, on December 21, 1995, representatives of plaintiffs met with Maria T. Bacino, Project Manager of the Bureau of Inland Regulation of the NJDEP for a pre-application conference. At that conference, Ms. Bacino informed plaintiffs that any proposed filling of wetlands in excess of one acre could be authorized only under a Freshwater Wetlands Permit and of the criteria for issuance of such a permit. Ms. Bacino stated additionally, according to plaintiffs,

that it was highly improbable and inconceivable that an Individual Freshwater Wetlands Permit would ever be issued for the proposed office project for the Premises, that such permits were typically granted for small scale purposes such as making sewer connections, constructing driveways or instances involving the public need (such as construction of a county jail) and certainly not for the extent of fill required to develop this 9.67 acre tract.

Further, plaintiffs allege

Bacino ... underscored that the plaintiffs would not be able to demonstrate the unavailability of other sites in the region suitable for the construction of the proposed office building, as would be required to obtain an Individual Permit to develop the Premises. Bacino emphasized that MHF's proposed project was not the type of project for which an Independent Permit can be granted, as other available sites in the region are available for such projects. Bacino further stated

that she would be the person who would decide whether or not the permit would be granted.

Following the conference, on December 28, 1995, Ms. Bacino wrote to plaintiffs, stating in relevant part:

Based upon staff review of the information presented and discussed at the preapplication conference held on December 21, 1995, your proposed project has the following status in terms of the Program's administrative rules. Please understand that the following informal guidance and initial assessment is not a binding commitment, and does in no way reflect a decision by this Department or Program to approve or deny any forthcoming permit application for this project or site.

*Project Description*

The applicant is proposing to construct an office Building in Livingston Township, Essex County. The project proposal involves the filling of intermediate resource value, EPA priority wetlands for the construction of the building and parking areas. From staff discussions, several issues arose and are herein discussed as they relate to the project. Again, these issues are not meant to be definitive.

*Regulatory Issues*

A Letter of Interpretation was issued for this property.... The proposed filling of the wetland areas, which well exceeds one acre, could only be authorized under a Freshwater Wetlands Individual Permit.

The Individual Permit application process is outlined at N.J.A.C. 7:7a–11.1. The applicant was informed that the Department shall issue a the [sic] Individual Permit only if it finds that there is no practicable alternative to the proposed activity. An alternative shall be practicable if it is available and capable of being carried out after taking into consideration cost, existing technology, and logistics in light of overall project purposes. An alternative shall not be excluded from consideration under this provision merely because it includes or requires an area not owned by the applicant which could reasonably have been or be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

I trust this guidance helps you proceed along the design and development process.

Plaintiffs, thereupon, abandoned their effort to obtain regulatory approval by seeking an Individual Freshwater Wetlands Permit for any development of the property, and instead, on January 12, 1996, filed the within action seeking a declaration of inverse condemnation by regulatory taking and damages of $1,673,800, consisting of the difference in market value of the property as a

commercial office-building ($1,712,500) and its value as open space ($38,700).[2]

The State has now moved for summary judgment on plaintiffs' complaint, arguing that plaintiffs' claim of a regulatory taking is not ripe as the result of plaintiffs' failure to exhaust administrative procedures and remedies, since administrative relief may be available in the form of an Individual Permit for limited development of the wetlands and a Transition Area Waiver for development on "the more than 20 percent of the property that is not freshwater wetlands."

Plaintiffs have cross-moved for summary judgment on the first count of their complaint, arguing that such action would be futile under the facts presented.

In seeking summary judgment, the State notes that, in order for a regulatory taking to be found to exist, the facts must demonstrate that the state has "gone too far" in its interference with plaintiffs' reasonable investment-backed expectations and thus has taken private property for public use without just compensation in violation of the fifth and fourteenth amendments of the United States Constitution and article I paragraph 20 of the New Jersey Constitution. *Pennsylvania Coal Co. v. Mahon*, 260 *U.S.* 393, 415, 43 *S.Ct.* 158, 160, 67 *L.Ed.* 322, 326 (1922).[3] The State notes further that the enactment of a permitting system does not, by itself, constitute a taking, since

the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the

[2] The first count of plaintiffs' complaint alleges a permanent regulatory taking under the fifth and fourteenth amendments to the United States Constitution as well as applicable provisions of the New Jersey Constitution. The second count alleges a temporary taking as the result of a sewer moratorium existing from June 1988 to November 1993. Plaintiffs state that a holding in their favor on the first count would moot the second.

[3] The protections afforded by the just compensation clauses of the State and United States Constitutions have been held to be coextensive. *Bernardsville Quarry v. Bernardsville Borough*, 129 *N.J.* 221, 608 *A.2d* 1377 (1992).

permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

[*United States v. Riverside Bayview Homes, Inc.,* 474 *U.S.* 121, 127, 106 *S.Ct.* 455, 459, 88 *L.Ed.*2d 419, 426 (1985).]

Thus, the State's argument continues, before a claim of regulatory taking can be made, there must at least be an "authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County,* 477 *U.S.* 340, 348, 106 *S.Ct.* 2561, 2566, 91 *L.Ed.*2d 285, 294 (1986). Because that determination has not been made in connection with the property at issue, the State contends, the claims asserted by plaintiffs in this law suit are not ripe.

The State's argument accords with Supreme Court precedent. In this connection, it is useful to compare the line of cases upon which the State relies with the Supreme Court's recent decision in *Suitum v. Tahoe Regional Planning Agency,* 520 *U.S.* 725, 117 *S.Ct.* 1659, 137 *L.Ed.*2d 980 (1997). In *Suitum,* plaintiff had sought to construct a home on undeveloped land near Lake Tahoe. However, construction on the land was expressly prohibited by the 1987 Regional Plan promulgated by the Tahoe Regional Planning Agency because the land lay in a "Stream Environment Zone" where runoff would carry into the watershed. The Regional Plan in question did not "provide for the variances and exceptions of conventional land use schemes," but rather, addressed "the potential sharpness of its restrictions" by granting transferrable development rights (TDRs) to landowners. Following denial by the Planning Agency of permission to build and an unsuccessful appeal, plaintiff filed suit under 42 *U.S.C.* § 1983, claiming that the Agency's determinations constituted a regulatory taking of her property, regardless of the existence or value of the TDRs. The Supreme Court reversed the lower courts' determination that plaintiff's claim was unripe.

In reaching its conclusion, the Court discussed its prior decisions in *Agins v. City of Tiburon,* 447 *U.S.* 255, 100 *S.Ct.* 2138, 65 *L.Ed.*2d 106 (1980), *Hodel v. Virginia Surface Mining Reclamation Ass'n., Inc.,* 452 *U.S.* 264, 101 *S.Ct.* 2352, 69 *L.Ed.*2d 1 (1981), *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 *U.S.* 172, 105 *S .Ct.* 3108, 87 *L.Ed.*2d 126 (1985), and *MacDonald, supra,* 477 *U.S.* 340, 106 *S.Ct.* 2561, 91 *L.Ed.*2d 285, in which the doctrine of ripeness had been developed. The Court then concluded that two points about the requirement were clear:

> it applies to decisions about how a taking plaintiffs' own land may be used, and it responds to the high degree of discretion characteristically possessed by land use boards in softening the strictures of the general regulations they administer. As the Court said in *MacDonald,* "local agencies charged with administering regulations governing property development are singularly flexible institutions; what they take with the one hand they may give back with the other." *Id.* at 350 [106 S.Ct. 2561]. When such flexibility or discretion may be brought to bear on the permissible use of property as singular as a parcel of land, a sound judgment about what use will be allowed simply cannot be made by asking whether a parcel's characteristics or a proposal's details facially conform to the terms of the general use regulations.

> [*Suitum, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1667, 137 *L.Ed.*2d at 993.]

In contrast, the Court found that the demand for finality had been satisfied in Suitum's case, since there was no question as to how the regulations would apply to the land in question.

> Because the agency has no discretion to exercise over Suitum's right to use her land, no occasion exists for applying *Williamson County's* requirement that a landowner take steps to obtain a final decision about the use that will be permitted on a particular parcel.

> [*Id.,* 520 U.S. at ——, 117 *S.Ct.* at 1667, 137 *L.Ed.*2d at 993.]

■ The present case more closely resembles *Agins, Hodel, Williamson County,* and *MacDonald* than it does *Suitum.* In contrast to *Suitum,* the regulatory scheme governing the use of plaintiffs' land permits the issuance of variances in certain defined circumstances. Where a regulatory scheme "offers the possibility of a variance from its facial requirements, a landowner must go beyond submitting a plan for development and actually seek such a variance to ripen his claim." *Suitum, supra,* 520 *U.S.* at ——, 117 *S.Ct.* at 1666, 137 *L.Ed.*2d at 992, citing *Hodel, supra,* 452 *U.S.*

264, 101 *S.Ct.* 2352, 69 *L.Ed.*2d 1. Further, "rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." *MacDonald, supra,* 477 *U.S.* at 353 n. 9, 106 *S.Ct.* at 2568 n. 9, 91 *L.Ed.*2d at 297 n. 9.[4]

Here, neither the nature of allowable development nor its permissible scope have in any way been determined. As stated in *Williamson,*

> Our reluctance to examine taking claim until . . . a final decision [how an owner will be allowed to develop its property] has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," *Penn Central Transp. Co. v. New York City,* 438 *U.S.* [104] at 123, 98 *S.Ct.* [2646] at 2659, 57 *L.Ed.*2d 631 [ (1978) ], this Court consistently has indicated that among the factors of particular significance in the [taking] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. . . . Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

> [473 *U.S.* at 190–191, 105 *S.Ct.* at 3118–3119, 87 *L.Ed.*2d at 141.]

It is of course true that governmental land-use regulation may, under extreme conditions, constitute a taking. *See, e.g.; Suitum, supra,* and *Lucas v. So. Carolina Coastal Council,* 505 *U.S.* 1003, 112 *S.Ct.* 2886, 120 *L.Ed.*2d 798 (1992), cases in which no exception to construction bans existed. *See also, e.g., Schiavone Constr. Co. v. Hackensack,* 98 *N.J.* 258, 486 *A.*2d 330 (1985); *Morris County Land Improvement Co. v. Parsippany–Troy Hills Township,* 40 *N.J.* 539, 193 *A.*2d 232 (1963). However,

> the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. See *Hodel v. Virginia Surface Mining & Reclamation Ass'n.,* 452 *U.S.* 264, 293–297, 101 *S.Ct.* 2352, 2369–2371, 69 *L.Ed.*2d 1 (1981).

---

4 The *Suitum* Court identified and specifically declined to address the issue of how many proposals the landowner was required to make before an agency's determination was deemed final. 520 *U.S.* at —— n. 12, 117 *S.Ct.* at 1667 n. 12, 137 *L.Ed.*2d at 993 n. 12. Nonetheless, an argument can certainly be made here that some less grand proposal for development of the site at issue might still meet the plaintiffs' reasonable investment-backed expectations.

The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

[*Riverside Bayview Homes, supra,* 474 *U.S.* at 126–127, 106 *S.Ct.* at 459, 88 *L.Ed.*2d at 426.]

■  In the present case, it appears likely, although not certain, that a permit for the development that plaintiffs propose would be denied by the NJDEP. However, even if that were to be determined decisively, which it has not, the inquiry would not end, because

[l]and use planning is not an all-or-nothing proposition. A governmental entity is not required to permit a landowner to develop property to [the] full extent be might desire or be charged with an unconstitutional taking of the property. . . . [T]he refusal of the defendants to permit the intensive development desired by the landowner does not preclude less intensive, but still valuable development.

[*MacDonald, supra,* 477 *U.S.* at 347, 106 *S.Ct.* at 2565, 91 *L.Ed.*2d at 293, quoting decision of California Court of Appeal.]

*See also Bernardsville Quarry, supra,* 129 *N.J.* at 242–243, 608 *A.*2d 1377 (regulatory restrictions do not result in a taking even though they reduce income or profits, so long as they allow a just and reasonable return on investment.)

Under *N.J.S.A.* 13:9B–9b(2), the NJDEP can issue a freshwater wetlands permit only if it finds that the regulated activity "has no practicable alternative." *N.J.S.A.* 13:9B–10 creates a presumption that a practicable alternative exists. However, that presumption can be rebutted by demonstrating:

(1) That the basic project purpose cannot reasonably be accomplished utilizing one or more other sites in the general region that would avoid, or result in less, adverse impact on an aquatic ecosystem; and

(2) That a reduction in the size, scope, configuration, or density of the project as proposed and all alternative designs to that of the project as proposed that would avoid, or result in less, adverse impact on an aquatic ecosystem will not accomplish the basic purpose of the project; and

(3) That in cases where the applicant has rejected alternatives to the project as proposed due to constraints such as inadequate zoning, infrastructure, or parcel

size, the applicant has made reasonable attempts to remove or accommodate such constraints.

*See also, N.J.A.C. 7:7A–11.1(b)5; N.J.A.C. 7:7A–3.*

Plaintiffs in this case claim that their project will not be approved under paragraph (1), because other sites for commercial office buildings, unencumbered with wetlands prohibitions, exist in the area and thus any further attempt by them to obtain an Individual Freshwater Wetland Permit or a Transition Area Waiver would be futile. Even if that is true, plaintiffs have not provided evidence that they have explored either a reduction in size, scope, configuration or density, or that they have considered alternatives to the planned construction.[5] Plaintiffs' claim is therefore wholly unripe. Essential facts necessary to determine the nature and extent of permitted development remain unknown, and thus the existence, as well as the scope of a regulatory taking by the State cannot presently be determined.[6]

---

[5] Plaintiffs claim that residential and alternative uses other than as a commercial office building are specifically prohibited by Livingston's zoning ordinances. However, residential uses were permitted prior to plaintiffs' *Mt. Laurel II* suit, and were eliminated only as a result of settlement of that suit. Nothing has been proffered that would suggest that a zoning change, occurring initially at plaintiffs' request, could not now be undone.

The fact that the State has not approved construction of any other non-site specific project similar to plaintiffs' is, if true, likewise immaterial, since the evidence is not relevant to the issue of alternative use.

[6] It must be emphasized that this decision turns on the finality of the decision making process, not on exhaustion, as plaintiffs suggests. As stated by the Supreme Court in *Williamson:*

The question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable.... While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.
[473 *U.S.* at 192–193, 105 *S.Ct.* at 3119–3120, 87 *L.Ed.*2d at 142–143.]
The decision here is of the former type.

■ Similarly, plaintiffs' claim of a temporary taking as the result of the imposition of a sewer connection ban has not been perfected as the result of plaintiffs' failure to seek relief from that ban pursuant to applicable regulations. *See, N.J.A.C.* 7:14A–12.22 to 12.23 (eff. November 2, 1987); *N.J.A.C.* 7:14A–12.25 (eff. November 2, 1987); *N.J.A.C.* 7:14A–22.18 to 22.23 (eff. June 6, 1994); *N.J.A.C.* 7:14A.22.9, –22.13 and –22.14 (eff. June 6, 1994).

By reaching the conclusion that plaintiffs' claims are premature, I do not of course preclude compensation at a later date. *N.J.S.A.* 13:9B–22 provides:

a. Any person having a recorded interest in land affected by a freshwater wetlands permit issued, modified or denied pursuant to the provision of this act may file an action in a court of competent jurisdiction to determine if the issuance, modification or denial of the freshwater wetlands permit constitutes a taking of property without just compensation.[7]

The problem in this case lies, as previously stated, in the fact that no permit has been "issued, modified or denied."

The present decision is buttressed by the Appellate Division's recent opinion in *East Cape May v. Department of Environmental Protection.*, 300 *N.J.Super.* 325, 693 *A.*2d 114 (1997). In that case, the owners of property were informed by the NJDEP that their application pursuant to the Coastal Area Facility Review Act (CAFRA) to construct numerous multi-family homes lacked necessary information. The owners refused to provide the information, stating that the process would be both costly and futile, since

---

[7] If a court in a later action were to find that the statutory conditions had been met, plaintiffs' situation would raise the issue articulated by the *Lucas* Court as follows:

Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a rural tract in its natural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution in the value of the tract as a whole.

[505 *U.S.* at 1016 n. 7, 112 *S.Ct.* at 2894 n. 7, 120 *L.Ed.*2d at 813 n. 7.]

development of the property was regulatorily prohibited.[8] There-
after, the Director of the DEP issued a formal opinion denying a
development permit.   Upon its receipt, plaintiff filed an inverse
condemnation action, arguing that federal regulation had deprived
it of all economic use of the property.   The Appellate Division
reversed an order of summary judgment in plaintiffs' favor en-
tered by the trial court.   In doing so, the court relied on *N.J.S.A.*
13:9B–22b, which provides:

> b.  If the court determines that the issuance, modification, or denial of a
> freshwater wetlands permit by the department pursuant to this act constitutes a
> taking of property without just compensation, the court shall give the department
> the option of compensating the property owner for the full amount of the lost value,
> condemning the affected property pursuant to the provisions of the "Eminent
> Domain Act of 1971" ... or modifying its action or inaction concerning the
> property so as to minimize the detrimental effect to the value of the property.

That statute, the court concluded

> requires the DEP and the developer to confer about the realistic prospects for
> development whenever the agency has taken a position which, reasonably inter-
> preted, would impose limits on the utilization of property so draconian that they
> would amount to a constitutional taking.... An exchange of views and information
> is required as part of the administrative process, leading to the agency's communi-
> cating to the developer a reliable authoritative indication of what kind of develop-
> ment, if any, will be permitted and under what conditions.... We hold that
> *N.J.S.A.* 13:9B–22b contemplates and requires this mutual effort and administra-
> tive guidance and that it is part of the administrative process contemplated by the
> applicable regulatory scheme.   Until the developer has sought and obtained the
> requisite guidance from the DEP, or the DEP has failed or refused to provide it, no
> permanent taking has occurred.   Such a reliable, authoritative indication of what
> development will be permitted is required in this case.
>
> [300 *N.J.Super.* at 341, 693 *A.*2d 114.]

In *East Cape May* the plaintiff had already received a denial of
its CAFRA permit application at the time that its suit for inverse
condemnation was filed.   As a result, it was farther along in the
administrative process when legal action was taken than plaintiffs
are here.   Nonetheless, the court found that plaintiff's claim was

---

8 In fact, the property had been classified as "Low Acceptable Development
Intensity," a category that permitted development of not more than five percent
of the land.   The existence of freshwater wetlands comprising more than ninety
percent of the site that constituted habitat for several threatened or endangered
species further limited the land's development possibilities.

not ripe for adjudication. Under *East Cape May*'s analysis, the present plaintiffs' resort to the courts, before even applying for the necessary permits, clearly constitutes an impermissible end-run around established administrative procedures. Although plaintiffs may be correct that further pursuit of the permits required for the present project would be unnecessarily costly as well as futile, nothing prohibits a further preapplication conference between plaintiffs and representatives of the NJDEP to explore what lesser uses of the property at issue might receive administrative approval. Such a course would balance the administrative needs of the department with plaintiffs' legitimate concern that any money spent in the permitting process be focussed on realizable goals.

On the basis of the foregoing, the State's motion for summary judgment will be granted. and plaintiffs' action for inverse condemnation and damages will be dismissed without prejudice. Plaintiffs' cross-motion will be denied.