775 A.2d 54

DARWIN R. GRIFFITH, PLAINTIFF–RESPONDENT, v. STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 24, 2001—Decided May 15, 2001.

Before Judges PRESSLER, KESTIN and ALLEY.

*Rachel Horowitz*, Deputy Attorney General, argued the cause for appellant (*John J. Farmer, Jr.*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel; *Ms. Horowitz*, on the brief).

*Seymour J. Kagan,* argued the cause for respondent (*Berry, Kagan, Sahradnik, Kotzas & Riordan,* attorneys; *Mr. Kagan,* of counsel; *Carl W. Erler,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

This is an inverse condemnation case involving an alleged regulatory taking. Ultimately, and before entry of final judgment, defendant Department of Environmental Protection (DEP), by way of amelioration pursuant to the Freshwater Wetlands Protection Act (FWPA), *N.J.S.A.* 13:9B–1 to –30, and more particularly 13:9B–22b, accorded plaintiff Darwin R. Griffith all of the permits and approvals he required in order to develop his property in Little Egg Harbor Township, allowing him to construct a 26–foot road over wetlands and to subdivide the upland portion into forty-three sewered lots. The amelioration also included waiver by DEP of an $80,000 environmental mitigation expense chargeable to plaintiff and waiver of his application fees which would have amounted to an estimated $10,700. DEP now appeals from final judgments and orders of the Law Division, entered after the amelioration was effected, holding that prior to the amelioration, DEP had, by reason of its course of administrative action, temporarily taken the land of plaintiff Darwin R. Griffith; fixing damages for the temporary taking; and awarding plaintiff a counsel fee pursuant to *N.J.S.A.* 20:3–26c. We reverse both the temporary taking award and the counsel fee award.

This is the fourth time this matter has been before us, and our prior opinions, to which we hereafter refer, recite much of the factual and regulatory background. In sum, the sixty-three acre site, of which twenty-three acres are freshwater wetlands located in a residential zone, is within the Pinelands National Reserve but is not under the development jurisdiction of the Pinelands Commission. Plaintiff had been a part owner of the site as well as of additional acreage since 1966, but by reason of a partition action concluded in 1984, became the sole owner of this tract, then valued

at about $100,000, as well as of several other parcels, two of which he sold shortly after the partition judgment for about one million dollars. Since the site was essentially landlocked, he also obtained, by the partition judgment, an access easement to a public road, Bridge Road, over a tract to the west of the site.

In 1987 plaintiff sought approval from the Army Corps of Engineers for construction of a 26–foot wide road over the wetland portion, leading from a different public road to the uplands portion for which, however, no development application was then being made. DEP advised the Corps that a 26–foot road would be consistent with the State's coastal management plan, provided first, that plaintiff could demonstrate that there was no feasible alternative access to the site, and second, that plaintiff would agree to compensatory environmental mitigation activities. The Army Corps of Engineers never rendered a final decision, apparently because of the adoption of the FWPA, effective in 1988, by which the State assumed the Army Corps' jurisdiction in this regard. *See N.J.S.A.* 13:9B–2. Plaintiff's dealings from that point on were with the DEP.

Various complications then arose during the processing of the Fresh Water Permit (FWP) application, one of the first filed under the then new FWPA. To begin with, DEP became aware of the presence of an endangered species, Pine Barrens tree frogs, on the site, resulting in a wetlands resource reclassification from "intermediate" to "exceptional," a classification which required a greater buffer or transition area. DEP also learned of the Bridge Road access easement, which it believed could provide feasible alternative access. Finally, there was no submitted development plan for the uplands site demonstrating a public need for the access road that was the subject of the permit application. Accordingly, in 1989 the permit was denied, and plaintiff appealed the denial by way of a contested hearing conducted by the Office of Administrative Law. As the administrative appeal process evolved, it was finally administratively determined that the Bridge Road access was not a feasible alternative because of title prob-

lems, and after a further hearing, the resource classification issue was also ultimately resolved in plaintiff's favor.

Finally, on June 25, 1992, the date fixed by the trial judge as the date of taking, DEP issued an FWP permitting the construction of the road but limiting its width to sixteen feet, essentially for the reason that absent a development plan for the uplands, a showing had not been made justifying a wider road. DEP, however, also granted plaintiff leave to seek a major modification of the permit in the future consistent with any later submitted development plan. The permit also required plaintiff to obtain a stream encroachment permit and to submit a mitigation plan in compensation for the environmental disturbance before construction of the road. A further administrative appeal followed, the permit was modified in accordance with plaintiff's request for relocation of the road, and a final decision was issued by DEP for the 16–foot road on May 25, 1994. Plaintiff then appealed to this court from the 16–foot limitation of the FWP and several of its other provisions.

It was not until 1993, that is, after the initial issuance of the restrictive FWP, that plaintiff finally initiated administrative proceedings in order to obtain approval of development of the uplands site under the Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19–1 to –21. CAFRA was first enacted in 1973 for the purpose of protecting New Jersey's fragile coastal areas by providing development guidelines, to be administered by DEP, for any construction in the coastal area. *See N.J.S.A.* 13:19–2. Pursuant to plaintiff's request, a pre-application conference was held with DEP in June of 1993 at which plaintiff was advised, among other details, that in order for the site to be sewered for development, he would need an amendment to the Ocean County Water Quality Management Plan (WQM). Plaintiff was also advised several months later that the environmental mitigation required of him would probably have to be off-site rather than the less burdensome on-site mitigation earlier proposed. In November 1993, plaintiff submitted his CAFRA application seeking approval for forty-four single-family residences. DEP's initial response to

the submission was a pre-application conference clarification letter sent about a week later which raised various problems requiring resolution and which advised plaintiff that CAFRA had been amended that year by *L.* 1993, *c.* 190, to be effective the following year. The clarification letter, which was followed by a deficiency letter several weeks later, also advised plaintiff that consistent with the amendment, new implementing rules would further restrict development and that in order to maintain the benefit of the pre-amendment statute and rules, plaintiff's CAFRA application would have to be declared complete for final review prior to July 19, 1994, the effective date of the amendments.

In January 1994, plaintiff obtained preliminary approval of the required amendment of the WQM Plan from both Little Egg Harbor Township and Ocean County. DEP, however, in May 1994, disapproved the amendment because of its concern about the secondary impacts of extending sewer service to a limited growth area, and because there had been no showing that septic systems would not have been acceptable, thus obviating the need for sewers. In the meantime, DEP's consideration of the CAFRA application went forward, DEP reminding plaintiff of his need to complete the application before the new rules went into effect and requesting various categories of additional information. Plaintiff, however, refused to provide the requested information even after being warned by DEP in September 1994 that his CAFRA application under the original statute and regulations would be canceled if it was not timely forthcoming. Plaintiff nonetheless persisted in his refusal to provide the information, and on December 2, 1994, DEP canceled the CAFRA application for that reason but without prejudice to its resubmission under the new rules. During the following month, plaintiff unsuccessfully sought DEP's reconsideration of its WQM Plan, and on January 30, 1995, he appealed to this court from the CAFRA cancellation, the disapproval of the WQM Plan amendment, and DEP's mitigation requirements.

Although the two appeals were considered separately, we simultaneously issued both opinions on May 24, 1996. In the appeal

under Docket Number A–2667–94T5, we affirmed the CAFRA application cancellation, rejecting plaintiff's argument that completion for review was the date on which it was deemed sufficiently complete to warrant a public hearing, such a hearing having been held here. We thus sustained DEP's contention that it had never declared the application complete and hence that plaintiff was not entitled to the benefit of the prior rules. We also held that DEP had acted properly in refusing to declare the application complete by reason of plaintiff's refusal to submit the required additional information. We further rejected plaintiff's challenge to DEP's denial of approval of the amendment to the WQM Plan for the reason that plaintiff had failed to exhaust his administrative relief. For the same reason, noting further the lack of finality of the Commissioner's decision, we rejected plaintiff's challenge to DEP's disapproval of his proposed on-site mitigation plan. Finally, we concluded that DEP had not unduly delayed its review of plaintiff's plans, at least up until the time the notice of appeal was filed.

The appeal under Docket Number A–6024–93T2 involved the restrictive FWP. We concluded that DEP had been arbitrary in imposing the 16–foot restriction. It was our view that after plaintiff's submission of his CAFRA application on November 15, 1993, a date after initial issuance of the restricted permit but before completion of the administrative process, DEP should have taken into account the nature of the development of the uplands proposed therein and thus reconsidered its rationale that no plans had been disclosed indicating the need for a wider road. We also held that plaintiff should not have been required to apply for a major modification of the permit in the future since all of the relevant information was already known to DEP. Accordingly, we remanded to DEP for issuance of a permit allowing a road up to thirty feet in width and having a five-year term of viability before expiration. We also noted, by footnote 7 of our opinion, that in view of our direction to DEP to issue a satisfactory permit, it was not necessary for us to comment on plaintiff's contention that the restrictive permit DEP had issued constituted a regulatory taking.

In any case, DEP issued a permit satisfactory to plaintiff within several months after our opinion.

On November 6, 1996, several months after issuance of our two opinions, DEP invited plaintiff to submit a new CAFRA application, advising him that because of a 1996 amendment of *N.J.A.C.* 7:7E–5.4, the site now met the standards for moderate acceptable development intensity, substantially increasing the allowable impervious coverage. DEP expressly then advised him that it would be fruitful for him to pursue the CAFRA process and that a pre-application conference would be arranged. Plaintiff did not respond to that invitation and DEP's development guidance. Indeed, plaintiff initiated no administrative process at all by way either of a new application or an administrative appeal from any prior denials following our two 1996 opinions.

What plaintiff, to the contrary, chose to do was to continue this inverse condemnation action, which he had commenced in July 1995 by a complaint asserting that DEP's actions, starting in 1989, constituted a regulatory taking entitling him to compensation. The action was tried during the summer of 1997 on liability only, and the judge concluded that a taking had occurred on June 25, 1992, the date on which DEP had issued the 16–foot permit despite its issuance of the modified permit in 1996. In any event, as the result of the ensuing judgment entered on February 18, 1998, DEP advised plaintiff in March 1998 that it would permit development of the uplands site for forty single-family homes on sewered lots, subject to its receipt of acceptable grading and construction plans. It also agreed to approve a WQM Plan amendment and to permit, as mitigation, a monetary contribution of $80,000 to the Wetlands Mitigation Council. Various other apparently non-onerous conditions were also set forth. The offer was not accepted.

DEP then filed an appeal from the February 18, 1998, inverse condemnation order, and plaintiff cross-appealed from the fixing of the date of inverse condemnation as of June 25, 1992. Because commissioners had not been appointed, we granted leave to appeal and leave to cross-appeal *nunc pro tunc* to obviate a finality

problem in that regard. We issued our opinion under Docket Number A–4260–97T1 on May 3, 1999. We concluded that the trial court's February 18, 1998, judgment was interlocutory for an entirely different reason. We pointed out that *N.J.S.A.* 13:9B–22b of the FWPA provides that if the court finds that

> issuance, modification, or denial of a freshwater wetlands permit ... constitutes a taking of property without just compensation, the court shall give the department [DEP] the option of compensating the property owner for the full amount of the lost value, condemning the affected property pursuant to the provisions of the "Eminent Domain Act of 1971," P.L.1971, c. 361 (C.20:3–1 et seq.), or modifying its action or inaction concerning the property so as to minimize the detrimental effect to the value of property.

We then expressed agreement with *East Cape May Assocs. v. State of New Jersey Dep't of Envtl. Prot.*, 300 *N.J.Super.* 325, 339–342, 693 *A.*2d 114 (App.Div.1997), which held, in effect, that the amelioration opportunity thus afforded to DEP is an integral part of the regulatory process and that the State may, by granting amelioration, avoid the risk of having to acquire property by eminent domain. Accordingly, we reversed the trial court's inverse condemnation conclusion as premature since the State had not yet been afforded an amelioration opportunity. We thus remanded to the trial court to provide DEP with a "reasonable opportunity to explore methods to ameliorate plaintiff's alleged loss attributable to the denial of the FWP." *Griffith v. State of New Jersey Dep't of Envtl. Prot.*, No. A–4260–97T1 (App.Div. May 3, 1999). We expressed no further view of the merits of the controversy.

Within one month following our May 1999 remand, DEP advised plaintiff that it would approve upland development by way of an amelioration plan.[1] On July 23, 1999, in accordance with plaintiff's

---

[1] We note that the amelioration undertaking by DEP following our 1999 opinion was pursued by it even though we had not yet ruled on the taking issue and, apparently, in order to obviate any doubt that there had been no regulatory taking. We further note that while CAFRA does not have the same amelioration provision as FWPA, we assumed the applicability of that provision because of the intertwining of the FWPA and the CAFRA process, and that assumption was not

submission, DEP approved a development of forty-three single-family homes on sewered lots with one storm water detention basin, a new conforming FWP with a five-year term, and waiver by DEP of any monetary mitigation and application expenses. Trial on the remand took place within the next several months, the court concluding that there had been a temporary taking from June 25, 1992, the date of issuance of the restrictive permit, and continuing until September 1, 1999, the date the court found the amelioration—which in fact constituted a complete capitulation by DEP—to have been effective. The judge then fixed just compensation for that temporary taking at $264,850, and later awarded counsel fees and costs in the amount of $251,051.43. DEP appeals.

We address first the taking issue. To begin with, plaintiff has now obtained the approvals and permits necessary for development of the property. The taking, if a taking at all, is hence a temporary taking only. But it is clear that not every deprivation of use resulting from the land-use regulatory process constitutes a compensable taking. We appreciate the doctrinal complexities and competing public policies involved in determining whether a temporary deprivation of use is compensable as an exercise of eminent domain. *See, e.g., Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 216 *F.*3d 764 (9th Cir.2000), *petition for cert. granted,* —— U.S. ——, 121 *S.Ct.* 2589, 150 *L.Ed.*2d 749 (2001). But we are certain that this much at least is clear—normal or at least not unreasonable delays in the land-use permit and approval process as well as extraordinary delays not attributable to government do not constitute temporary compensable takings. That was the view the United States Supreme Court expressed in *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 *U.S.* 304, 321, 107 *S.Ct.* 2378, 2389, 96 *L.Ed.*2d 250, 268 (1987). And that has been the consistent view of

---

challenged. In any event, DEP does not in any way repudiate its action, whether characterized as statutory amelioration or voluntary permitting.

this jurisdiction. *See, e.g., Schiavone Constr. Co. v. Hackensack Meadowlands Dev. Comm'n,* 98 *N.J.* 258, 486 *A.*2d 330 (1985); *Toms River Affiliates v. State of New Jersey Dep't of Envtl. Prot.,* 140 *N.J.Super.* 135, 355 *A.*2d 679 (App.Div.), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1077 (1976); *Meadowlands Reg'l Dev. Agency v. Hackensack Meadowlands Dev. Comm'n,* 119 *N.J.Super.* 572, 293 *A.*2d 192 (App.Div.), *certif. denied,* 62 *N.J.* 72, 299 *A.*2d 69 (1972).

■ As was cogently explained by Judge Brochin in *East Cape May Assocs. v. State of New Jersey Dep't of Envtl. Prot., supra,* 300 *N.J.Super.* at 342–343, 693 *A.*2d 114, in the context, as here, of an FWPA permit:

> If the end result of the process of applying for development permits is to allow reasonable utilization of the .. property, the developer will not necessarily be entitled to compensation for the delay between the initial denial of its application and the ultimate issuance of a development permit. The process of applying for a development permit and satisfying the DEP's requirements for its issuance is necessarily protracted. The delay incident to the process, like any other burden of permissible regulation, is a burden inherent in the ownership of property and not a constitutional taking. (Citations omitted.)

■ In determining the temporary taking issue in the FWPA context, there is, moreover, an additional step of the regulatory process that must be considered, and that is DEP's right to an opportunity to ameliorate. As further explained by *East Cape May, supra,* 300 *N.J.Super.* at 340, 693 *A.*2d 114:

> One purpose of *N.J.S.A.* 13:9B–22b is obviously to avoid exposing the State to the risk of having to acquire property by exercise of the power of eminent domain whenever an application for a development permit is denied. We are obligated to construe the statute to effectuate that purpose. It can and should be effectuated by interpreting the statute to mean that the administrative process leading to the issuance or denial of a development permit is not complete until the State has had the opportunity to decide whether the application of the regulations to a particular property should be relaxed pursuant to *N.J.S.A.* 13:9B–22b to avoid a taking.

The taking issue before us then is simply this: was there an unreasonable delay fairly attributable to DEP between the date of DEP's issuance of the restrictive FWP in 1992 and its ultimate grant, by way of amelioration, of all the necessary approvals and permits in September 1999? We think it plain, beyond any

reasonable dispute of material fact, that this question must be answered in the negative for a variety of reasons.

To begin with, it is evident that the ultimate use of the tract required that all of the necessary permits and approvals be obtained. Plaintiff chose to start with the FWP. That initial application, as we noted in our 1996 opinion, was essentially an abstract one since it was, by plaintiff's choice, unaccompanied by a CAFRA development application which would have indicated the need for a road of a specific width. The permit was initially restricted primarily for that reason, and it was not until after the administrative appeal from the June 1992 issuance of the restrictive permit was well underway that the CAFRA application was finally filed. In any event, plaintiff cannot be deemed to have been deprived of the viable economic use of his land by reason of the restrictive permit alone since no economic use could have been realistically made until approval of the CAFRA permit. But, most significantly, it was not until this court in its 1996 opinion held that a less restrictive permit should have been issued that DEP's option to ameliorate that restriction under *N.J.S.A.* 13:9B–22b ripened. The fact of the matter is that DEP effectively extended the regulatory process in a reasonable and statutorily permissible manner by opting promptly thereafter to ameliorate by issuing an FWP in full compliance with plaintiff's road-development application.

Pursuant to *R.* 2:2–3(a)(2), this court is the forum to which appeals from administrative action must be directed in the first instance. We therefore construe the reference in *N.J.S.A.* 13:9B–22b to the court determination which triggers the amelioration opportunity as including a decision by this court on appeal from an administrative action alleged to constitute a taking or to be otherwise arbitrary or unreasonable. Plainly, therefore, the administrative process in respect of the FWP was not concluded until an amelioration opportunity was provided to DEP. It exercised its amelioration option and, as a result, plaintiff obtained his desired permit. Beyond that, we are satisfied that appeals from

administrative action are in any event sufficiently part of the administrative process itself as to come within the ambit of reasonable administrative delays which, by definition, do not constitute a taking.

Thus, up until 1996 there was no taking, temporary or otherwise, in respect of the access-road issue. Also in that year, in our opinion in the companion CAFRA case we held that the CAFRA permit was properly canceled by reason of plaintiff's refusal to provide information properly requested by DEP, that a CAFRA permit could be reapplied for, that administrative relief had not been exhausted in respect of the WQM amendment, that there was neither exhaustion nor Commissioner finality in respect of the mitigation challenge, and that there had been up to that point no undue delay by DEP in the administrative process. These holdings, which compel a non-taking conclusion, were, of course, not only the law of the case but binding as well on the trial court. The point, of course, is that up to that time, namely May 1996, there cannot be deemed to have been a regulatory taking, and we so held. Moreover, by that time plaintiff had made the deliberate choice to eschew further resort to the regulatory process and instead to file this action alleging inverse condemnation. In this regard, we deem of particular significance plaintiff's disregard of the communications from DEP shortly after our 1996 opinions were rendered that advised him of the favorable regulatory change, inviting his submission of a new CAFRA application, strongly suggesting that such a submission would be fruitful, and offering to arrange a pre-application conference.

It is not for us, of course, to speculate as to why plaintiff chose instead to continue with this inverse condemnation action. We must, however, conclude that there was then no regulatory taking because plaintiff forewent the invitation to submit its applications. That was the reason for its continued deprivation of use, not any ultimate preclusion imposed by the statute or the implementing regulations or administrative action. We agree with the observation of *MHF Holding Co. v. State of New Jersey*

*Dep't of Envtl. Prot.*, 314 *N.J.Super.* 87, 96–97, 713 *A.2d* 1096 (Law Div.1997), also an FWPA controversy, that the requirement that a permit be obtained before development does not itself constitute a taking. That indeed is the law of the land. *See United States v. Riverside Bayview Homes, Inc.*, 474 *U.S.* 121, 126–127, 106 *S.Ct.* 455, 459, 88 *L. Ed.*2d 419, 426 (1985). Consequently, there could have been no taking here, temporary or otherwise, until plaintiff had pursued the available regulatory process to its conclusion. *See MHF Holding Co. v. State of New Jersey Dep't of Envtl. Prot.*, *supra*, 314 *N.J.Super.* at 98–99, 713 *A.*2d 1096. This inverse condemnation action was, simply, premature. Singularly in point is the federal decision in *Walcek v. United States*, 44 *Fed.Cl.* 462 (1999), in which the court, noting that the test of temporary taking in this context is whether the government is responsible for an extraordinary delay in the regulatory process, *id.* at 467–468, expressly held that plaintiff's exercise of the choice to forego the available administrative application process in favor of an inverse condemnation action defeated its temporary taking claim. As the court there noted:

> the Corps [Army Corps of Engineers] failed to grant the [wetlands] application only because plaintiffs did not provide requisite information and state permits. As such, plaintiffs are incorrect in arguing that the Corps temporarily deprived them of the economic use of the property, when the undisputed facts indicate that any such deprivation was due to plaintiffs' own failure to complete the permitting process, as well as their strategic decision to initiate this lawsuit, rather than pursuing the permitting process to a final merits determination.
>
> [*Id.* at 468–469]

Precisely the same can be said of plaintiff here. There was no taking.

 We turn now to the counsel fee issue. Counsel fees were awarded pursuant to *N.J.S.A.* 20:3–26c, which provides in full as follows:

> When a plaintiff shall have brought an action to compel condemnation against a defendant having the power to condemn, the court or representative of the defendant in case of settlement shall, in its discretion, award such plaintiff his reasonable costs, disbursements, and expenses, including reasonable appraisal, attorney and engineering fees actually incurred regardless of whether the action is terminated by judgment or amicable agreement of the parties.

Although the statute does not expressly so require, we are satisfied that the legislative intent must have been, as in the case of other fee-shifting statutes, to permit an award of costs and expenses only to those plaintiffs who prevail, at least in part. It would, in our view, make little sense to require a defendant condemning authority which is held not to have inversely condemned, to be nevertheless subject to an award of professional fees in favor of a plaintiff who has failed to prove a taking, and, obviously, any such award against a governmental body would be contrary to public policy.

 It is, moreover, our view that plaintiff did not prevail and is hence not entitled to a counsel fee award because he failed to show a compensable taking, temporary or otherwise. Our holding on the taking issue is that no temporary taking occurred for at least three reasons: first, there was no unreasonable delay in the regulatory process attributable to DEP; second, DEP forestalled a taking declaration by its conciliatory amelioration, which included all necessary development permits and approvals and a waiver of fees and mitigation costs amounting to almost one hundred thousand dollars; and third, plaintiff's temporary deprivation of use was largely attributable to his own actions including his failure to comply with DEP's request for information on his first CAFRA application, a failure but for which that application might have been granted, as well as his failure to submit a second CAFRA application that had the potential to permit development along the lines he had initially requested. These were his failures, not DEP's.

 Nor do we believe that entitlement to an award lies in *N.J.S.A.* 13:9B–22b. We appreciate that that section speaks literally in terms of a court determination that DEP's challenged action "constitutes a taking," and it is that determination that triggers DEP's amelioration opportunity. Thus the argument might be made that the pre-amelioration taking determination is *ipso facto* sufficient to support the conclusion that plaintiff prevailed in the inverse condemnation action whether or not an

acceptable amelioration followed. We, however, reject that argument. As we explained in *East Cape May Assocs. v. State of New Jersey Dep't of Envtl. Prot.*, *supra*, 300 *N.J.Super.* at 340–341, 693 *A.*2d 114, that section of the statute must be interpreted as rendering amelioration an integral part of the regulatory process in order to accomplish its statutory purposes of both avoiding DEP's exposure to the risk of having to acquire property by eminent domain and encouraging DEP and the developer to confer about the realistic prospects for development when DEP proposes the imposition of "limits on the utilization of property so draconian that they would amount to a constitutional taking." *Id.* at 341, 693 *A.*2d 114. Consequently, as we there concluded, the statute must be construed as if it read:

> If the court [or the DEP] determines that the issuance, modification, or denial of a freshwater wetlands permit by the department pursuant to this act *would constitute* a taking of property without just compensation, the court shall give the department the option of . . .
>
> [*Ibid.*]

Consistent with this rationale, with which we entirely concur, we think it plain that the judicial declaration requiring DEP to exercise one of the options afforded by *N.J.S.A.* 13:9B–22b does not itself constitute a determination that there has been a taking but only a determination that the challenged agency action *would* constitute a taking if not satisfactorily ameliorated. For this reason, a property owner cannot ordinarily be deemed to have prevailed in an inverse condemnation action in which the result of DEP's exercise of its amelioration opportunity is the granting of development permits sufficient to permit the owner to enjoy the economic utilization of his property.

In this regard, we perceive a significant difference between amelioration in the context of *N.J.S.A.* 13:9B–22b and the settlement referred to by *N.J.S.A.* 20:3–26c that would entitle a property owner to an award of counsel fees. That settlement is an amicable conclusion of the inverse condemnation litigation. Amelioration is, however, a step in the regulatory process which must be concluded before there may be any judicial determination of a

taking.[2] In sum, we find an irreconcilable conflict in the proposition that DEP can avoid a taking determination and the financial consequences thereof by post-denial amelioration but that it must at the same time and notwithstanding the amelioration, bear the financial burden of paying the professional fees awardable to a prevailing plaintiff under *N.J.S.A.* 20:3–26.

Beyond the amelioration considerations, we are also satisfied that this inverse condemnation action was the result of a strategic decision that delayed, if not entirely forestalled, the regulatory process. As we have pointed out, no taking had occurred prior to its institution since at that time the regulatory process was still available to plaintiff. For that reason as well, in view of the favorable result plaintiff obtained through the regulatory process, he cannot be deemed to have prevailed in the inverse condemnation action.

Because we are satisfied that there was no taking and that the award of counsel fees was improvident, we need not consider DEP's challenges to the just-compensation procedure and methodology employed by the court or its objections to the calculation of the counsel fee.

The judgments and orders appealed from are reversed and we remand to the trial court for entry of an order dismissing the complaint.

---

[2] There may be instances in which the Agency's conduct which leads to an amelioration has been so egregiously unreasonable in the circumstances as to justify a temporary-taking conclusion, but for the reasons we have articulated, this is not one of those cases.