777 A.2d 1015 (2001)
343 N.J. Super. 110
EAST CAPE MAY ASSOCIATES, a Florida limited partnership, Plaintiff-Respondent/Cross-Appellant,
v.
STATE of New Jersey, DEPARTMENT OF ENVIRONMENTAL PROTECTION, and Robert Shinn, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 14, 2001.
Decided July 25, 2001.
*1018 Rachel Horowitz, Deputy Attorney General, argued the cause for appellants/cross-respondents (John J. Farmer, Jr., Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Horowitz, on the brief).
Steven P. Perskie, Atlantic City, argued the cause for respondent/cross-appellant (Fox, Rothschild, O'Brien & Frankel, attorneys; Mr. Perskie, of counsel and on the brief with Kathryn D. Portner).
Edward Lloyd, Newark, Rutgers Environmental Law Clinic, attorney for amicus curiae New Jersey Conservation Foundation (John D. Echeverria and John T. Zeidler, of counsel; Mr. Lloyd, on the brief).
Gordon N. Litwin, Newark, argued the cause for amicus curiae, The American Littoral Society, the City of Cape May, and the Cottagers' Association of Cape May, Inc. (Ansell Zaro Grimm & Aaron, attorneys; Mr. Litwin, of counsel; Andrew J. Provence, on the brief).
Before Judges HAVEY, WEFING and CUFF. *1016 *1017
*1019 The opinion of the court was delivered by HAVEY, P.J.A.D.
This is the second chapter of an inverse condemnation case involving a claim of regulatory taking arising from enforcement of the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30. N.J.S.A. 13:9B-22b (§ 22b) provides:

If the court determines that the issuance, modification, or denial of a freshwater wetlands permit by the department pursuant to this act constitutes a taking of property without just compensation, the court shall give the department the option of compensating the property owner for the full amount of the lost value, condemning the affected property pursuant to the provisions of the "Eminent Domain Act of 1971," P.L. 1971, c. 361 (C.20:3-1 et seq.), or modifying its action or inaction concerning the property so as to minimize the detrimental effect to the value of the property.

[Emphasis added.]
The central issue raised by this appeal is whether rule making is necessary before the DEP avails itself of the amelioration opportunity under § 22b to modify its actions "so as to minimize the detrimental effect to the value of the property." We are also called upon to review the trial court's determination that the "denominator" in the taking fraction was the 100-acre tract owned by plaintiff, East Cape May Associates (ECM).
ECM, a limited partnership, owns a 100 acre undeveloped tract located on the east side of Pittsburgh Avenue in the City of Cape May. A contiguous 100-acre tract on the west side of Pittsburgh Avenue is or has been owned or developed by ECM's principals and an affiliated partnership. The DEP has designated most of the 100-acre eastern tract as being of "exceptional resource value" which subjects the property to heightened protection against development. See N.J.S.A. 13:9B-7, -10c. On July 23, 1990, ECM's principals, Philip Robinson and Thomas Brodesser, applied for a CAFRA permit (Coastal Area Facility Review Act, N.J.S.A. 13:19-1 to -21) to construct 366 single-family residential units on the eastern 100 acres. The property was conveyed by Robinson and Brodesser to ECM on December 20, 1990, for $10. By letter dated June 26, 1990, the DEP's regional supervisor indicated to ECM that its CAFRA application would probably be denied due to the quality and extent of wetlands on the property, citing CAFRA standards governing special areas, endangered species and habitats, storm water runoff, and other pertinent regulations.
On January 24, 1991, the DEP denied the CAFRA permit. In response, ECM filed the present action seeking compensation for the regulatory taking of the eastern tract, citing the DEP's denial of ECM's CAFRA permit. ECM claims that there has been both a permanent and temporary taking in violation of the State and federal constitutions.
In East Cape May Assocs. v. State, Dep't of Envtl. Prot., 300 N.J.Super. 325, 693 A.2d 114 (App.Div.1997) (East Cape May I), we reversed an order for summary judgment in favor of ECM which declared that there had been a regulatory taking of its property. We agreed with the trial court that the pertinent DEP regulations affecting ECM's property indicate that "unless those regulations are relaxed in significant respects, no application for any economically meaningful development of that property will be granted." Id. at 338, 693 A.2d 114. We added:
If the property currently owned by East Cape May [the 100-acre easterly tract] *1020 represents the full extent of the property which we should consider to determine the taking issue, and if those regulations will not be relaxed pursuant to N.J.S.A. 13:9B-22b, the State's regulatory scheme so "excessively interferes with property rights and interests" that they leave East Cape May without "viable, economically-beneficial uses of [its] land" and therefore have effected a constitutional taking. See Gardner v. New Jersey Pinelands Comm'n, supra, 125 N.J. at 210-16, 593 A.2d 251, and cases cited therein.

[Ibid.]
However, we remanded with direction that the trial court address the "denominator" argument raised by the State; that is, that the entire 200 acres owned by ECM or its principals, situate on both the east and west side of Pittsburgh Avenue, must be considered in determining whether there has been a taking. Id. at 353-54, 693 A.2d 114. We directed that, upon resolution of the "denominator" issue, "[a]t the option of the DEP, an opportunity should be afforded it to work with East Cape May to formulate an acceptable development plan pursuant to N.J.S.A. 13:9B-22b." Id. at 354, 693 A.2d 114. In that respect we interpreted § 22b as requiring "the DEP and the developer to confer about the realistic prospects for development whenever the agency has taken a position which, reasonably interpreted, would impose limits on the utilization of property so draconian that they would amount to a constitutional taking." Id. at 341, 693 A.2d 114.
On remand, the DEP undertook an analysis of pertinent regulations affecting ECM's property with the goal of presenting a plan of development acceptable to ECM. During the remand hearing, Richard Kropp, Director of Land Use Programs for the DEP, testified it was his goal to draft a proposal that would both protect the environmental resource, and, at the same time, permit ECM an economically viable use of its property. Kropp considered the physical attributes of the site, local zoning laws and other State and federal regulations. He did not consider ECM's investment in the property. Under Kropp's supervision, the DEP staff divided and ranked the eastern tract, which is entirely wetlands and wetlands barriers, into four areas of habitat priority. The DEP then retained a professional planner, Carl Hintz, to determine where best to place potential development so that it would have the least impact on the most valuable habitat.
Hintz testified as an expert in the fields of planning, wetlands, and landscape architecture that he considered the habitat value of the site, the proximity of the development to the ocean and existing development, and the zoning of the site. Ultimately, Hintz developed three proposals of twenty, forty and sixty-four units. The sixty-four unit plan groups most of the proposed residential units in the southeast corner of the tract. The remaining eight units were separated and placed on block 1163, west of the other proposed units. It was the DEP's view that this plan saved a large continuous area of habitat and preserved the more valuable habitats and minimized the "edge" between development and natural habitat. Hintz testified that there was a strong market for the type of development he proposed.
The DEP presented the twenty and forty-unit proposals to ECM. On February 25, 1998, after the DEP proposed the forty-unit plan, Kropp and several Deputy Attorneys General met with the attorneys for ECM. ECM advised the DEP that the forty-unit offer did not match its investment in the eastern tract. Thus, the meeting ended without agreement. Shortly before trial, the DEP offered the sixty-four *1021 unit plan. ECM rejected this proposal as well.
ECM presented testimony indicating that it had incurred aggregate costs associated with the eastern 100-acre tract of $1,712,181.50, in additional to litigation costs associated with the tract totaling $1,339,209.40.[1] ECM's certified public accountant testified that, adjusting the total costs to present day value, ECM had expended $5,482,073.95.
The State's appraisal expert, George W. Powell, testified that, assuming ECM could obtain the necessary permits for the development of 366 units, the Army Corps of Engineers (Corps) would probably only permit the development of 183 homes which, Powell concluded, was the highest and best use of the eastern tract. Applying the income and comparison sales approaches, Powell valued the property at $4,500,000, including the probable costs of litigation against the Corps and costs of mitigation requirements the Corps might impose. Powell testified that the market value of the property based on the sixty-four building lots proposed by the DEP, was $4,382,300.
ECM's appraisal expert, Richard E. Hall, applied the cash-flow discounted method of appraisal. According to Hall, assuming that the property had received approvals for a 366 unit subdivision, it had a value of $28,860,000.
The testimony presented regarding the "denominator" issue was as follows. In 1954, Robinson bought the bulk of the western 100 acres from the City for a purchase price of $6,283. At about the same time the City sold the eastern tract to Morris Soble who in turn sold the property to Robinson in October 1954 for a payment of $20,000, with the promise that if Robinson "ever made any money with the ground" he would pay Soble an additional $20,000. Additional tracts were purchased by Robinson on the western side of Pittsburgh Avenue in 1954 through 1957. From approximately 1941, the easterly tract was zoned exclusively for residential use. The zoning west of Pittsburgh Avenue permitted hotels, boarding houses, rooming houses as well as apartments.
From 1956 through 1965, Robinson did nothing to develop any part of the land. However, in May 1965, he and Brodesser formed Cape May Greene, Inc. (Greene). Robinson agreed to sell lots to Greene one block at a time. It was planned that Greene would construct approximately 1,000 residential homes on the west side and 2,000 homes on the east side of Pittsburgh Avenue. In 1965 or 1966, the City zoned the west side of Pittsburgh Avenue as R-4 (multi-family residences) and the east side as R-2 (single-family residences).
In 1965, the City and Greene entered into a "working agreement" for the purpose of encouraging large-scale development.[2] The City agreed to provide water *1022 and sewer mains. A second "working agreement" was entered into in 1969. From 1965 until 1973, Greene built and sold 395 units on the western tract. In 1971, Robinson sold a portion of the eastern tract to the United States Coast Guard for $210,000.
In 1972, the City reneged on the working agreements with Greene. Litigation ensued resulting in an order declaring that the working agreements were valid and enforceable.
In 1974, after the enactment of CAFRA, Robinson transferred the balance of the western tract and the entire eastern tract to Greene for $1. Thereafter, in 1974, 1975 and 1979, Greene obtained exemptions from the CAFRA permit requirements, see N.J.S.A. 13:19-5, allowing an exemption for facilities upon which construction was in progress before the effective date of the statute. However, in 1979, the DEP informed Greene that a CAFRA permit would be required before it developed the balance of the western tract, approximately fifty acres.
In 1980, Robinson moved to Canada. Brodesser continued building on the western tract through a new corporation in which he was the sole stockholder, Village Greene Homes, Inc. (Village). Under the scheme, Greene transferred individual lots to Village. Village in turn sold the approved lots to homeowners.
Robinson testified that he and Brodesser never addressed the question of developing the eastern tract until 1979. He stated that he never considered the eastern and western tracts as a "unified, integrated, single parcel...." In 1981, the City rezoned the eastern tract to low density residential, planned unit development. In 1986, Greene filed a subdivision application to build ninety-six quad units on the eastern tract. Additional litigation ensued regarding the 1965 and 1969 "working agreements." In 1987, Judge Gibson ruled that the working agreements encompassed the lands on both sides of Pittsburgh Avenue and therefore the City had an obligation to provide the infrastructure for development on the eastern tract.
In 1986, Greene transferred the entire eastern tract and nine lots in the western tract to Robinson and Brodesser for $1. Greene was thereafter dissolved. The FWPA was enacted in 1987, effective July 1, 1988. In 1988, the DEP cited Robinson and Brodesser for filling and site preparation of certain lots on the eastern tract without a CAFRA permit. The DEP filed a complaint in the Chancery Division seeking to enjoin Robinson and Brodesser from further filling, clearing, site preparation or building on the lots. One of the defenses Robinson and Brodesser advanced was that the eastern tract was exempt from CAFRA because it was part of the larger tract on which construction had already begun. Judge Gibson held that the eastern tract was not part of the larger tract for purposes of defining, under CAFRA, a "facility" under construction and therefore the eastern tract was subject to CAFRA. In so ruling, Judge Gibson relied on the fact that Robinson and Brodesser had made no attempt to develop the eastern tract until the mid-1980's, well after the passage of CAFRA.
During litigation with the DEP, Robinson and Brodesser in December 1988, filed a CAFRA application to construct ninety-six units on the eastern tract. The DEP advised that because of the extent of wetlands on the eastern tract and the presence of threatened and endangered species, it was "not likely" that it would approve the ninety-six unit project. In the meantime, the City granted Robinson and Brodesser preliminary major subdivision approval for 366 single family homes on the eastern tract. In July 1990, Robinson *1023 and Brodesser filed a formal CAFRA permit application for the 366-unit residential development. The DEP issued a preliminary analysis stating that it was likely the Director would deny the application. However, it requested additional information which Robinson and Brodesser refused to provide.
By deed dated December 20, 1990, Robinson and Brodesser transferred title to the eastern tract to ECM for the stated consideration of $10. ECM is a Florida limited partnership of which Robinson and Brodesser are the general partners.
On January 24, 1991, the DEP denied Robinson's and Brodesser's CAFRA permit because: (1) the applicants failed to comply with many DEP regulations; (2) the applicants failed to provide necessary information requested by the agency; (3) the applicants intended filling wetlands that constitute ninety percent of the site; (4) the upland areas of the tract were encompassed within wetlands buffer zones, where development was prohibited unless the applicants met certain defined conditions; and (5) the tract was the home of threatened and endangered species. In July 1991, the City rezoned the property to residential, cluster/preserved wetlands. The Mayor testified that the City opposed any development on the eastern tract.
After an extensive bench trial, the trial judge determined that the relevant denominator of the taking fraction was the property to the east of Pittsburgh Avenue. The court considered the "questions" we deemed relevant in deciding the denominator question, see East Cape May I, supra, 300 N.J.Super. at 353-54, 693 A.2d 114, and found, based on the evidence, that the 100-acre eastern tract must be deemed the denominator because: (1) the tracts to the east and west side of Pittsburgh Avenue were not purchased at the same time from the same grantors; (2) the tracts were not contiguous; (3) there was a break in the development on the western tract, during which Robinson did not participate; (4) the initial acquisition costs were borne by Robinson alone; (5) the tracts were never involved in any common permit application or development plan; (6) the tracts were never included in the same development application; (7) the tracts have always been zoned differently; and (8) at the time the tracts were acquired there were no development restrictions.
The trial court was not persuaded by the State's argument that because Robinson and Brodesser referred to the entire 200 acres in the working agreements with the City, the tracts should be considered one property for the purposes of the taking analysis. The court concluded that this single fact did not outweigh all other factors favoring treating the eastern tract as the relevant denominator.
The trial court then addressed the question whether the DEP's offer to allow ECM to build sixty-four single-family homes on the property obviated the need for compensation. The court concluded that the DEP was without legal authority to make an offer under § 22b because it had not promulgated guidelines governing the waiver of its regulations. The court was of the view that N.J.S.A. 13:9B-22b was intended only to permit the waiver of FWPA regulations and not regulations promulgated under the CAFRA. The court was also convinced that:
the DEP proposals do not satisfy the purpose of N.J.S.A. 13:9B-22(b), which is to avoid exposing the State to the risk of having to acquire property by the exercise of the power of eminent domain, nor does it minimize the detrimental impact to the value of property caused by the regulations.
The court nevertheless conceded that the development of sixty-four homes had some *1024 value but, because of the "substantial conflict in the appraisals," it could "not say that the 22(b) offer is such that no compensation should be paid to Plaintiff beyond allowing 64 units." It concluded that "[t]he issue of value of the parcel and the value of the allowed 64 units are issues which must be presented to the condemnation commissioners and if no agreement is reached ultimately to a jury for determination." The court also observed: "This is not a case about reduction of profits and therefore reduction of land value, or restrictions on uses resulting in reduced income or profits. This is a case about denial of all practical use of most of the property."
The court concluded that ECM's temporary taking claim was moot as a result of its rulings on the denominator and N.J.S.A. 13:9B-22b issues. Nonetheless, it found that there would be no basis for finding a temporary taking because the administrative delays in the case were not extraordinary and the DEP acted in good faith. It thus dismissed the temporary taking claim.
The court also dismissed ECM's contract claim, which was predicated on its assertion that its predecessors' acquisition of riparian rights in 1903 and 1907 created a contract right, the violation of which entitled it to damages.

I
This appeal requires us to decide whether the trial court correctly resolved the denominator issue. We also are required to address issues respecting the correct utilization of § 22b in regulatory taking cases. Other issues briefed by the parties on this appeal have already been decided by us in East Cape May I. For example, there we determined that if it is found on remand that the denominator is solely the eastern tract, "and if" the regulations are not or cannot be "relaxed" pursuant to § 22b, the regulatory scheme so "`excessively interferes with property rights and interests' that they leave East Cape May without `viable economically-beneficial uses of [its] land'...." 300 N.J.Super. at 338, 693 A.2d 114 (quoting Gardner v. New Jersey Pinelands Comm'n, 125 N.J. at 205, 210-16, 593 A.2d 251 (1991)). We also held that:
Robinson and Brodesser clearly had "distinct, investment-backed expectations" before the effective date of CAFRA for the substantial development of their East Cape May property for housing. East Cape May is entitled to assert whatever development rights its predecessors would have had. Cf. Nollan v. California Coastal Comm'n, 483 U.S. 825, 833 n. 2, 107 S.Ct. 3141, 3147 n. 2, 97 L.Ed.2d 677, 687 n. 2 (1987) (holding that the present owners of the property are the transferees of their predecessors' full rights in the property so that the owners' rights are not diminished by their having acquired it after adoption of the regulation which effects the taking).

[Id. at 337, 693 A.2d 114.]
See Palazzolo v. Rhode Island, ___ U.S. ___, ___, 121 S.Ct. 2448, 2464, 150 L.Ed.2d 592, 615 (2001) ("a regulation that otherwise would be unconstitutional absent compensation is not transformed into a background principle of the State's law by mere virtue of the passage of title"). The holdings in East Cape May I concerning these issues constitute the law of the case, and we find no compelling reason to revisit them.

II
We first address the State's contention that the trial court erred in not concluding that the entire 200-acre parcel owned by ECM and its principals or affiliates constitutes *1025 the denominator for purposes of resolving the taking issue.
As we observed in East Cape May, supra, 300 N.J.Super. at 343-40, 693 A.2d 114, to determine whether a taking has occurred, a court must compare the ratio of the land subject to the regulation with the property owner's entire property or "the parcel as a whole." Id. at 348, 693 A.2d 114. The determination of the parcel as a whole has been dubbed the denominator "problem." Id. at 343, 693 A.2d 114. In East Cape May I, we examined the federal and state case law addressing the denominator issue, and developed the following list of ten, nonexclusive factual questions that "may affect the formulation of the rule for the definition of the `property.' " Id. at 353-54, 693 A.2d 114. We said:
Determining the takings denominator in the present case requires a much more complete factual record than now exits. What entities own or owned the property west of Pittsburgh Avenue? What part of it, if any, do those entities still retain? When did they build on it and when were any parts of it disposed of? What is the relationship of East Cape May to the entities which own or owned the property west of Pittsburgh Avenue? When and for what consideration was the land on either side of Pittsburgh Avenue acquired? When, why and for what consideration was the property east of Pittsburgh Avenue transferred to its present ownership? What part of the property west of Pittsburgh Avenue was subject to wetlands controls or other governmental restrictions while it was owned by East Cape May's principals or transferors? What is the current municipal zoning of the property? Is there any difference in the zoning applicable to the land east and west of Pittsburgh Avenue? Was development restricted to the western tract in anticipation of the more stringent regulations applicable to the eastern part? The answers to all of these questions may affect the formulation of the rule for the definition of the "property" which is relevant to East Cape May's claim that its property has been deprived of all viable economic uses.

[Ibid.]
In Karam v. State, Dep't of Envtl. Protection, 308 N.J.Super. 225, 238-39, 705 A.2d 1221 (App.Div.), aff'd o.b., 157 N.J. 187, 723 A.2d 943 (1999), cert. denied, 528 U.S. 814, 120 S.Ct. 51, 145 L.Ed.2d 45 (1999), we observed that the questions posed by East Cape May I, pertained to the history of the ownership and development of the property.
The trial court addressed and answered each of the questions posed by us in East Cape May I in the context of the testimony given. It described the acquisition history of both the eastern and western tracts, noting the tracts were purchased from separate persons or entities. The court also found significant that the easterly tract was not contiguous with the western tract; it was separated from Pittsburgh Avenue by intervening lots, in some cases having more than 300 feet in depth. Also significant was the history of development of the western tract by Greene, and that no plan was ever prepared or submitted for a single development of both parcels. The court reviewed the history of the zoning of the two tracts, noting that no common land use restrictions have ever been imposed on the 200-acre tract as a whole. The court also found significant that ECM's principals had developed or sold nearly the entire western tract by 1988, before its principals applied for a CAFRA permit to develop the eastern parcel. Also significant was that in 1988, when the State instituted a Chancery Division action to preclude development of the *1026 eastern tract without a CAFRA permit, Judge Gibson accepted the DEP's position that the property east of Pittsburgh Avenue would require a CAFRA permit and was not grandfathered under N.J.S.A. 13:19-5, based on the development that occurred on the westerly tract.
Summarizing its findings of fact, the trial court concluded:
It is clear that the 200 acres were the result of the purchase of segmented parcels, none of which contained restrictions other than local zoning at the time of the respective purchases. Title to the property on both sides of Pittsburgh Avenue changed for legitimate purposes to effectuate corporate ownership or partnership ownership. The fact is that since 1965 ownership may have changed in form, nonetheless, the principles were always the same. The property east and west of Pittsburgh Avenue was not one parcel when purchased and cannot be now by virtue of anything the developer has accomplished by way of the separate and slow development of residences. As indicated the properties were purchased without restriction other than local zoning, and it is clear from the factual record that at the time of the purchases some 40 plus years ago, no restriction could have been foreseen to prohibit the filling and development of the wetlands. This is simply not a situation where the developer maximized the development of the usable land and saved the wetlands for a condemnation claim. It was completely fortuitous that development did not begin on the east side of Pittsburgh Avenue.
....
The relevant "denominator" for the purposes of the inverse takings analysis in this action is the property east of Pittsburgh Avenue. This conclusion rests on the totality of the above findings of fact, keeping in mind, that no one factual determination is of overriding significance in the "denominator" issue. It is emphasized that it is the totality of those facts that lead this Court to believe that the land east of Pittsburgh Avenue is the realistic and fair approach to the "denominator" issue.
We are satisfied that the trial court's determination is supported by substantial credible evidence in the record as a whole. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). The westerly and easterly tracts were purchased separately from separate parties and are not strictly contiguous because they are separated by half blocks that are owned by unrelated parties. The zoning of the two tracts is and has always been different, and ECM's predecessors began to develop and sell lots from the western tract long before they knew that any of the land would be subject to governmental development restrictions.
Moreover, the two tracts were never part of a common development scheme. On this point, Palm Beach Isles Assocs. v. United States, 208 F.3d 1374, 1380-81 (Fed.Cir.), aff'd on rehearing, 231 F.3d 1354 (Fed.Cir.2000), is instructive. There, a group of investors bought 311.7 acres of land in Florida in 1956. Id. at 1377. A road traversed the property, with 261 acres of upland oceanfront property to the east of the road. Ibid. This parcel was sold in 1968 for approximately $1,000,000. Ibid. In 1990, the Corps denied the investors a permit to dredge and fill the remaining 50.7 acres on the westerly side of the road. Id. at 1377-78. The Federal Circuit rejected the Corps' argument that the relevant parcel was 311.7 acres, finding significant that the investors never planned to develop the parcel as a single unit. Id. at 1381. The court also noted that the larger 261-acre tract was sold *1027 well before the Clean Water Act was enacted in 1972. Ibid. It declared that the development of the larger tract was "physically and temporarily remote from, and legally unconnected to" the 50.7-acre tract. Ibid.
As in Palm Beach, the two tracts here were never subject to a single development plan, and further, much of the development and sale of the westerly tract occurred before the enactment of CAFRA and the FWPA.

III
The DEP argues that the trial court erred in concluding that the DEP had no authority to make its sixty-four unit offer to ECM pursuant to § 22b without dulypromulgated regulations.
In East Cape May I, supra, 300 N.J.Super. at 354, 693 A.2d 114, we remanded the case for trial on the denominator issue and to allow the DEP, at its option, "to formulate an acceptable development plan pursuant to N.J.S.A. 13:9B-22b." The issue concerning the necessity of rule-making was not raised by the parties nor addressed by us.
We agree with the State that generally an administrative agency has broad discretion to decide a fact-specific case without the need to adopt formal, particularized rules and regulations. See In re Suspension of Heller, 73 N.J. 292, 302-05, 374 A.2d 1191 (1977); Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 482, 284 A.2d 161 (1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Because of the particularized nature of the dispute, a problem may be so varied in nature that no general regulation will be helpful in resolving the issue. Sheeran v. Progressive Life Ins. Co., 182 N.J.Super. 237, 247, 440 A.2d 469 (App.Div.1981). On the other hand, the Legislature may not vest unbridled discretion in an administrative agency; due process requires that " `administrators must do what they can to structure and confine their discretionary powers through safeguards, standards, principles and rules.'" Crema v. New Jersey Dep't of Envtl. Prot., 94 N.J. 286, 301, 463 A.2d 910 (1983) (quoting City of Santa Clara v. Kleppe, 418 F.Supp. 1243, 1261 (N.D.Cal.1976), aff'd in part and rev'd in part on other grounds sub nom. City of Santa Clara v. Andrus, 572 F.2d 660 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978)).
Applying the criteria pronounced by our Supreme Court in Crema, supra, 94 N.J. at 299, 463 A.2d 910; State, Dep't of Envtl. Prot. v. Stavola, 103 N.J. 425, 433, 511 A.2d 622 (1986), and Metromedia, Inc. v. Director, Div. of Tax., 97 N.J. 313, 331-32, 478 A.2d 742 (1984), we conclude that the DEP's approval of a plan pursuant to § 22b to ameliorate a regulatory taking claim must be made in accordance with regulations adopted pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15. Section 22b vests the agency with broad discretion to "modify[ ] its action ... so as to minimize the detrimental effect to the value of property." "Modifying" the denial of a FWPA permit in this case implicates waiver or relaxation of both FWPA and CAFRA standards, the result of which "affect[s] the public-at-large or an entire field of endeavor or important areas of social concern...." See Crema, supra, 94 N.J. at 299, 463 A.2d 910. Further, rule-making is necessary because § 22b is intended "to be applied generally and uniformly" in all cases where a claim of regulatory taking is made as a result of the enforcement of the FWPA and pertinent administrative regulations. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742. We suspect that the issue will be raised in future cases, as it *1028 has been in this case and recently in Griffith v. State, Dep't of Envtl. Prot., 340 N.J.Super. 596, 775 A.2d 54 (App.Div. 2001), where, but for the ameliorative effect of § 22b, the State may be compelled to invoke its eminent domain powers.
Regulations are also necessary to prescribe legal standards that are not otherwise expressly provided for by the enabling statute. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742. No guidance is provided by the FWPA respecting the methodology to be employed in fashioning a proposal pursuant to § 22b. In our view, the absence of standards "encourages arbitrary action," deprives the public of a meaningful understanding of the process, and inhibits judicial review of agency action. SMB Assocs. v. New Jersey Dep't of Envtl. Prot., 264 N.J.Super. 38, 54, 624 A.2d 14 (App.Div.1993), aff'd, 137 N.J. 58, 644 A.2d 558 (1994).
The DEP itself has recognized the necessity of regulations and standards for waivers in other contexts. See N.J.A.C. 7:7A-7.2 (waiver of stream encroachment permit rules); N.J.A.C. 7:26B-2.3 (de minimus quantity exemption from environmental cleanup responsibility rules); N.J.A.C. 7:50-4.63 (waiver of strict compliance with Pinelands Comprehensive Management Plan). Likewise, our courts have not hesitated to declare that waiver of environmental regulations requires rulemaking. See In re CAFRA Permit No. 87-0959-5 Issued to Gateway Assocs., 152 N.J. 287, 308, 704 A.2d 1261 (1997) (an agency seeking to waive its substantive regulations "should adopt a regulation pertaining to any such waiver and setting forth appropriate standards to govern agency decision-making"); SMB Assocs., supra, 264 N.J.Super. at 56, 624 A.2d 14 (same).
We leave it to the agency to frame the appropriate regulations, applying its expertise in this specialized area, and employing its own staff, resources and experience. In re Amendment of N.J.A.C. 8:31B-3.31, 119 N.J. 531, 543, 575 A.2d 481 (1990). Suffice it to say that the standards must be fashioned so as to accommodate the competing constitutional and policy considerations raised in the context of a regulatory taking case. Consideration must be given to the property owner's claim that it has "distinct investmentbacked expectations," Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978), and that the State's regulatory scheme, without the agency modifying its action, so "excessively interferes with property rights and interests" that it denies all practical use of the property. Gardner, supra, 125 N.J. at 205, 593 A.2d 251. Thus, at the very least, if the purpose of the § 22b amelioration opportunity is to nullify a taking claim, the DEP, consistent with duly-promulgated guidelines, must articulate how the proposed density and number of units offered to the property owner achieves that goal.
Waiver of standards for the purpose of devising a § 22b offer obviously clashes with the public's right to demand that our environment be protected by the State agency charged with that function. By enacting the FWPA, the Legislature found that freshwater wetlands "preserve drinking water supplies," "provide a natural means of flood and storm damage protection," "retard[ ] soil erosion," "provide ... habitats for a major portion of the State's fish and wildlife," and help preserve surface waters particularly during drought periods. N.J.S.A. 13:9B-2. Moreover, the statement of the legislative purposes of CAFRA emphasizes the importance of preserving coastal areas: "The Legislature finds and declares that New Jersey's ... [coastland areas including wetlands] constitute *1029 an exceptional, unique, irreplaceable and delicately, balanced physical, chemical and biologically acting and interacting natural environmental resource...." N.J.S.A. 13:19-2.
Consequently, the DEP's role in enforcing its regulations under the FWPA and CAFRA is daunting. It must be diligent in preventing the yard-by-yard destruction of environmentally sensitive land. "[L]and itself is a diminishing resource ... [and][e]nvironmentally-sensitive land is all the more precious. Hence, a proposed development that may constitute only a small insult to the environment does not lessen the need to avoid such an offense." Gardner, supra, 125 N.J. at 208, 593 A.2d 251. Thus, the State's strong interest in protecting wetlands and preserving coastal areas must be fundamental to § 22b guidelines.
Therefore, § 22b guidelines by necessity must identify the substantive policies of the governing legislation and set forth specific factors relevant to the agency's decision that waiver will not run counter to those legislative goals. At the very least, the process must identify what regulation or standard will be waived, and how that waiver will not compromise the overall regulatory scheme. In some cases, it may be that waiver will be so contrary to the legislative goals and public interest that such an offer cannot be made. In such a case, the State may have to pay the price. But if the DEP determines that, in accordance with its regulations, waiver of standards will not be inimical to the public good or compromise the legislative will, its offer may constitute a legitimate amelioration of a regulatory taking claim.
The need for regulations is underscored by the facts of this case. The State presented fairly detailed testimony from its experts explaining how various physical attributes of the site, zoning laws, and other state and federal regulations were considered before the DEP made its proposals to ECM. The DEP's staff and experts were directed to develop a plan that would take into consideration the habitat value of the site, the proximity of the development to the ocean and zoning laws. One goal of the plan was to minimize the amount of "edge"; that is, the line between development and habitat.
However, as noted, the DEP made three proposals to ECM. The first plan proposed twenty units, the second forty units, and the third sixty-four units. We cannot tell from the record how or why the DEP raised its offer from twenty to sixtyfour units. ECM and amicus American Littoral Society and the City of Cape May argue with some persuasion that the disparity in the number of units offered is evidence of the arbitrary nature of the State's actions. It is suggested that the offers were orchestrated by the Attorney General's office, not the DEP, as part of a negotiation ploy, rather than the carefully informed judgment of the DEP staff. We cannot resolve that question on the record before us.
However, we do know from the record that when ECM's CAFRA permit application for 366 units was denied in June 1990, the DEP cited as a basis for rejection several regulations including: (1) wetlands buffer area standards; (2) critical wildlife habitat areas; (3) storm water runoff; (4) a migratory bird survey; (5) the barrier island corridor; and (6) acceptable density of development and other pertinent regulatory standards. Although pressed at oral argument, the DAG was unable to inform us what specific standards had been waived in order to permit the DEP to make the sixty-four unit proposal. Consequently, neither we nor the public can make an informed judgment as to whether or not the proposal is compatible with the *1030 legislative goals of CAFRA and the FWPA.
ECM urged during oral argument before us that, if we determine that rulemaking is required, the DEP should not be given a second opportunity to make a § 22b proposal in accordance with dulypromulgated regulations. This is so, ECM reasons, because the DEP has not seen fit to promulgate regulations at any point during the lengthy procedural history of this case. We do not agree.
When in August 1994, the trial court entered summary judgment in ECM's favor, the DEP found itself in uncharted waters. During the summary judgment proceedings, the State had argued that there had been no taking in view of § 22b's safety valve provision. East Cape May I, supra, 300 N.J.Super. at 338-39, 693 A.2d 114. As far as we can tell from the record, ECM did not then argue that § 22b was inoperable because no regulations were in place. Indeed, on the DEP's appeal from the summary judgment order, ECM did not take that position before us. Consequently, in East Cape May I, we had no occasion to address the issue.
It was not until after our remand in East Cape May I that ECM raised, for the first time, the rule-making issue. Notably, while the matter was pending, the DEP was defending a regulatory taking claim in Griffith, in which the DEP invoked § 22b, and had done so without a judicial caution that rule-making was a condition precedent to invocation of § 22b's safety value procedure. Moreover, on remand the trial court in this case concluded that the DEP had acted in good faith in making its § 22b offer. In the circumstances, it would not serve the public's interest by foreclosing the DEP from its statutorily-created amelioration opportunity.

IV
We agree with the State that the trial court erred in concluding that, because § 22b is a provision under the FWPA, it does not apply to CAFRA standards.[3] In East Cape May I, we held explicitly that the DEP was empowered by § 22b to make a development offer to ECM, and remanded with direction that the parties work together to formulate an acceptable development plan. 300 N.J.Super. at 354, 693 A.2d 114. We so held with full understanding that waiver of CAFRA standards were implicated. Id. at 341, 693 A.2d 114. Moreover, in Griffith, supra, we endorsed the use of § 22b in a CAFRA application case, observing that "while CAFRA does not have the same amelioration provision as FWPA," we presumed the applicability of that provision "because of the intertwining of the FWPA and the CAFRA process...." 340 N.J.Super. at 607, n. 1, 775 A.2d 54.
This "intertwining" is evident when the legislative history of the FWPA is considered. When the FWPA was enacted in 1987, more than a decade after CAFRA, the Legislature recognized that the FWPA might regulate areas already regulated by existing statutes, including CAFRA. Therefore, the DEP was directed to "consolidate the processing of wetlands related aspects of other regulatory programs which affect activities in freshwater wetlands, including, but no limited to, ... permits required pursuant to ... [CAFRA]... with the freshwater wetlands permit process established herein so as to *1031 provide a timely and coordinated permit process...." N.J.S.A. 19:9B-5a. Additionally, N.J.S.A. 13:9B-30 provides that the FWPA preempts all previously enacted statutes regulating freshwater wetlands:
It is the intent of the Legislature that the program established by this act for the regulation of freshwater wetlands constitute the only program for this regulation in the State.... [T]his act, on and subsequent to its effective date, shall supersede any law or ordinance regulating freshwater wetlands enacted prior to the effective date of this act.

[Emphasis added.]
In New Jersey Chapter of Nat'l Ass'n of Indus. and Office Parks v. New Jersey Dep't of Envtl. Prot., 241 N.J.Super. 145, 150-57, 574 A.2d 514 (App.Div.), certif. denied, 122 N.J. 374, 585 A.2d 379, 380 (1990), we held that under N.J.S.A. 13:9B-30, the DEP may only regulate wetlands concerns through the FWPA, not through other statutes that may tangentially relate to wetlands such as CAFRA. However, the DEP must continue to administer the other overlapping permit programs (such as CAFRA) to the extent that they are predicated upon a different regulatory concern. Id. at 156-57, 574 A.2d 514.
The primacy of the FWPA in freshwater wetlands regulation is reinforced by an amendment to CAFRA enacted in 1993 (after enactment of the FWPA), which provides: "The provisions of this act [CAFRA] shall not be regarded as to be in derogation of any powers now existing and shall be regarded as supplemental and in addition to powers conferred by other laws...." N.J.S.A. 13:19-19.
Thus, the provisions of the FWPA, including § 22b, take precedence over CAFRA in cases where, as here, the primary regulatory concern is freshwater wetlands. Accordingly, the DEP has the power under § 22b to develop a plan to allow ECM some development, even though ECM originally filed a CAFRA application. The judge erred in deciding otherwise.

V
Although the trial court determined that the DEP was without authority to make a § 22b proposal, it found that the sixty-four unit proposal had "some value," but not enough value to avoid the conclusion that there had been a taking of the property considering the fact that there had been a "denial of all practical use of most of the property." The trial court determined that the condemnation commissioners should place a value on the sixty-four unit proposal and deduct that amount from the valuation fixed for the taking of the entire tract.
Essentially, the trial court accepted ECM's argument that the "minimize the detrimental effect" language in § 22b simply means that the value of the DEP's proposal should be deducted from the value of the entire tract, as fixed by the condemnation commissioners. We reject that argument. As we stated in East Cape May I, supra, 300 N.J.Super. at 340, 693 A.2d 114, a purpose of § 22b "is obviously to avoid exposing the State to the risk of having to acquire property by the exercise of the power of eminent domain whenever an application for a development permit is denied." (Emphasis added). We added that there is a regulatory taking "if" the DEP's regulations "will not be relaxed pursuant to [§ 22b]...." Id. at 338, 693 A.2d 114. In Griffith, supra, we expressed agreement with East Cape May I, stating that § 22b:
must be interpreted as rendering amelioration an integral part of the regulatory process in order to accomplish its statutory purposes of both avoiding *1032 DEP's exposure to the risk of having to acquire property by eminent domain and encouraging DEP and the developer to confer about the realistic prospects for development when DEP proposes the imposition of "limits on the utilization of property so draconian that they would amount to a constitutional taking."
[340 N.J.Super. at 613, 775 A.2d at 64 (quoting East Cape May I, supra, 300 N.J.Super. at 340-41, 693 A.2d 114) (emphasis added).]
We decline to depart from these holdings in this case.
The trial court's determination that ECM's property has been "taken," despite the fact that the DEP may allow development on a portion of the property, ignores fundamental regulatory taking principles. Application of such principles "requires a fact-sensitive examination of the regulatory scheme, focusing on whether it substantially advances a legitimate public purpose and whether it excessively interferes with property rights and interest." Gardner, supra, 125 N.J. at 205, 593 A.2d 251; and see Bernardsville Quarry, Inc. v. Borough of Bernardsville, 129 N.J. 221, 232, 608 A.2d 1377 (1992); see also Palazzolo v. Rhode Island, supra, ___ U.S. at ___, 121 S.Ct. at 2473, 150 L.Ed.2d at 626 (agreeing with the Rhode Island Supreme Court which held that all economically beneficial use of eighteen acres of coastal wetlands was not deprived where upland portions of the property could be developed with a one single-family oceanfront home, with a development value of $200,000).
In resolving the issue of whether a regulation excessively burdens a private property interest, it is clear that the mere "[d]iminution of land value itself does not constitute a taking[,]" nor does impairment of marketability alone. Gardner, supra, 125 N.J. at 210, 593 A.2d 251. Restriction on uses that reduce income or profits do not necessarily result in takings. Ibid. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 414-15, 43 S.Ct. 158, 159-60, 67 L.Ed.2d 322, 325-26 (1922). The trial court ignored these well-settled principles by holding that the DEP had taken the entire eastern tract merely because the land is worth less when developed in accordance with a § 22b offer than it would if ECM were allowed to develop the land as originally planned.
We remand for the purpose of allowing the DEP to promulgate regulations. The DEP shall thereafter have the amelioration opportunity afforded by § 22b. The trial court, upon receiving the DEP's § 22b proposal, shall review it (as part of the inverse condemnation proceedings) to determine whether it comports with the duly-promulgated regulations.
If the § 22b proposal is sustained, the trial court must then determine whether there is a regulatory taking of the entire property notwithstanding the proposal made by the DEP, keeping in mind that impairment of the marketability of land or reduction of income or profits do not necessarily result in a taking. Gardner, supra, 125 N.J. at 210, 593 A.2d 251. If ECM retains a viable economically beneficial use of its property under the DEP's proposal, there is no taking, despite the fact that a substantial portion of ECM's property will remain undeveloped. Id. at 215, 593 A.2d 251.

VI
We reject ECM's argument on its cross-appeal that there has been a temporary *1033 taking. In East Cape May I, supra, 300 N.J.Super. at 352, 693 A.2d 114, we made clear that the delay inherent in an administrative permit process is a burden incident to the ownership of property and, therefore, is not a compensable taking. We expressed our skepticism that there had been a temporary taking based on the facts then before us:

Even if we assume that an unduly protracted application process might constitute a temporary taking, there is no basis in the present summary judgment record for concluding that, as a matter of law, the duration of the process in this case has been, or will have been, so disproportionate to the complexity of the regulatory scheme that the process itself was the equivalent of a temporary taking of the property.
[Id. at 343, 693 A.2d 114 (emphasis added).]
Nevertheless, we directed that the trial court could "consider anew" whether there had been a temporary taking after the DEP had the opportunity of submitting a proposal under § 22b. Ibid.
Here, there is no basis on the present record before us to conclude that there has been a temporary taking. Robinson's and Brodesser's CAFRA permit application was filed in July 1990. When the DEP requested additional information, Robinson and Brodesser refused to provide it. The application was denied on January 24, 1991. Despite this denial, there was no taking because the DEP still had the option of allowing the owners to develop the site under § 22b. East Cape May I, supra, 300 N.J.Super. at 340-41, 693 A.2d 114; see also Griffith, supra, 340 N.J.Super. at 608-09, 775 A.2d 54. It was understandable, however, that the DEP failed to make a § 22b offer until after our decision in East Cape May I. As stated, our interpretation of § 22b was novel and there was no reason that the DEP should have anticipated it.
Once our opinion in East Cape May I was issued, in April 1997, the DEP acted promptly in developing a proposal that would provide ECM an economically beneficial use of its land, while protecting the environmental resource. It began work on the proposal in the summer of 1997 and hired a planner who issued a thirteen-page planning report in December 1997. Shortly afterwards, the DEP made its first § 22b offer to ECM on February 25, 1998. After the flat-out rejection of this offer, the DEP made two subsequent § 22b proposals, the last one on October 15, 1998, even though ECM had made no counter proposals.
In sum, the trial court's finding that the delay in the application process was not "extraordinary" is amply supported by the evidence. Thus, there was no compensable temporary taking. We are confident the DEP will, on remand, move with dispatch to preclude such a claim in a future proceeding.

VII
On cross-appeal, ECM maintains that it is entitled to damages for the State's breach of the 1903 and 1907 contracts which granted ECM's predecessor-in-title a right to fill the eastern tract.
In 1903, the Company bought from the State at a price of $2,500 the riparian rights for a large area of tidal lands within Cape May. These lands included the eastern and western tracts. The grant gave the Company
the right and privilege under the covenants and conditions of this grant, to exclude the tide water from so much of the lands in the first and second tracts above described as lie under tide water by filling in or otherwise improving the *1034 same, and to appropriate the said lands under water above described to its and their exclusive private use.
In 1907, the Company bought a larger area of riparian rights from the State at a price of $10,000. This area also included the eastern and western tracts. The grant gave the Company
the right to dredge and reclaim any and all of the sounds, creeks, inlets, thoroughfares, and other waterways and adjoining marsh lands within the bounds above described, and shown on the map hereto annexed; together with all the right, title and interest of the State of New Jersey to said waterways and lands, and lands underwater.
In 1903, the Company, under an agreement with the City, deposited three million cubic yards of fill on the Company's land, including the eastern tract.
The trial court dismissed ECM's contract claim for breach of the 1903 and 1907 grants. It reasoned that a landowner bears the risk that the Legislature may change the laws so as to defeat contractual rights related to the land.
Karam, supra, 308 N.J.Super. at 240-42, 705 A.2d 1221, supports the court's rejection of the contract claim. There, the DEP denied the plaintiffs-landowners a development permit to build a dock on their land, despite the fact that in 1924, their predecessors-in-title had been granted the riparian rights to construct such a dock. Id. at 240-41, 705 A.2d 1221. We rejected plaintiffs' argument that the riparian grant created a reasonable investment-backed expectation that they could build a dock. Id. at 240, 705 A.2d 1221. We noted that the State has a public trust in land covered by tide waters. Id. at 240, 705 A.2d 1221. We continued: "It is thus plain that the 1924 riparian grant from the State to the Schweinerts [the predecessors-in-title] did not create an absolute and perpetual right to construct a dock, free from all legislative and regulatory intervention." Ibid.
Our reasoning in Karam is equally applicable here. The 1903 and 1907 riparian grants did not forever grant the landowners the right to fill the wetlands on the eastern tract, free of all government regulation.
ECM's attempt to distinguish Karam from the instant case is unconvincing. ECM argues that the riparian grant in Karam was conditional because it was obtained after the enactment of the Waterfront Development Act of 1914, N.J.S.A. 12:5-1 to -2, which required permits for waterfront development. However, as defendants point out, tidally-flowed land has always been subject to the public trust doctrine. Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 311, 471 A.2d 355, cert. denied sub nom, Bay Head Improvement Ass'n v. Matthews, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); Karam, supra, 308 N.J.Super. at 240, 705 A.2d 1221; Arnold v. Mundy, 6 N.J.L. 1, 3 (Sup.Ct.1821). That doctrine provides that the sovereign never waives its right to regulate the use of public trust property, such as land covered by tide water. Karam, supra, 308 N.J.Super. at 240, 705 A.2d 1221. So, as in Karam, the 1903 and 1907 riparian grants were made with the understanding that the State had the right to continued regulation of the land.
Moreover, the case ECM relies upon for the principle that it is entitled to damages, United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), supports the opposite view. In Winstar, supra, 518 U.S. at 891-99, 116 S.Ct. at 2462-66, 135 L.Ed.2d at 1001-06, the Court recognized that when the government is acting as a sovereign, it is not *1035 liable for contract damages under the sovereign acts doctrine. That doctrine provides that where the government's subsequent action which breaks or modifies the contract was "merely incidental to the accomplishment of a broader governmental objective[,]" the government action will supersede the contract. Ibid. Accord Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1575 (Fed.Cir.1997), cert. denied, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). On the other hand, if the subsequent legislation promotes the government's self-interest in avoiding its contractual obligations, then the sovereign acts doctrine may be unavailable as a defense. Ibid.
Here, there is no question that when the Legislature passed CAFRA and the FWPA, its primary concern was to solve generalized environmental problems and not to weasel out of its 1903 and 1907 contractual obligations to the Company.
In sum, the trial court properly dismissed ECM's contract claim.
Affirmed in part, reversed in part and remanded for further proceedings.
NOTES
[1] The litigation costs included those incurred with regard to Chattin v. Cape May Greene, Inc., 243 N.J.Super. 590, 581 A.2d 91 (App. Div.1990), aff'd, 124 N.J. 520, 591 A.2d 943 (1991). In that case, Cape May Greene, Inc., formed by Robinson and Brodesser in 1965 to construct homes on the east and west side of Pittsburgh Avenue, was charged with consumer fraud regarding an unrelated development in Ventnor. ECM reasoned that the Chattin litigation costs were attributable to the Cape May property because a judgment had attached to the land east of Pittsburgh Avenue in connection with the Chattin litigation.
[2] In 1965, the zoning ordinance was amended to R-2, permitting single-family residences. The westerly tract was zoned R-4, a multifamily residence district. The properties on each side of Pittsburgh Avenue were zoned differently under subsequent amendments to the zoning ordinance.
[3] While this matter was pending on appeal, the DEP adopted N.J.A.C. 7:7-1.10, a regulation authorizing the agency to "relax" the application of standards applicable to CAFRA permits. See 32 N.J. Reg. 563. We do not consider the rule sufficiently detailed to provide meaningful review of a § 22b proposal.