823 A.2d 873

UNITED SAVINGS BANK, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 6, 2003—Decided June 4, 2003.

Before Justice WALLACE, JR.,[1] (temporarily assigned) and Judges CIANCIA and AXELRAD.

*Francis P. Maneri* argued the cause for appellant (*Dilworth Paxon,* attorneys; *Mr. Maneri,* on the brief).

*Lewin J. Weyl* argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Mr. Weyl,* on the brief).

The opinion of the court was delivered by

---

[1] Justice Wallace did not participate in oral argument. However, the parties consented, prior to him taking the oath of office as an Associate Justice of the Supreme Court, to his participation in the decision.

CIANCIA, J.A.D.

Plaintiff United Savings Bank (USB) appeals a summary judgment dismissing its inverse condemnation complaint against defendant, Department of Environmental Protection (DEP). The ruling was based upon a finding that USB had failed to exhaust its administrative remedies. In denying USB's subsequent motion for reconsideration the trial court also added that plaintiff's claim did not ripen because USB did not own the property when the action was brought.

On appeal, USB argues that summary judgment was inappropriate because discovery had not yet been undertaken and the "doctrine of futility" relieved USB of the need for further administrative proceedings. In regard to the latter, USB also argues that DEP failed to pass regulations thereby preventing any possible administrative amelioration in favor of USB. We find no merit in these contentions.

The present dispute goes back a number of years and centers on efforts to develop 61.4 acres of land in Gibbsboro Township, known as the Tanglewood subdivision. From 1987 through 1991 USB loaned money to an entity named Terra–Tech Development Corp. so that the unimproved land could be developed by the construction of residential dwellings. The property, in part, consisted of wetlands that initially were under the jurisdiction of the Army Corps of Engineers (Corps). Terra–Tech had received all necessary preliminary municipal permits for the planned development prior to passage of the Freshwater Wetlands Protection Act (FWPA), *N.J.S.A.* 13:9B–1 to –30, effective July 1, 1988.

In 1991 Terra–Tech defaulted on its mortgage obligations and USB foreclosed. Title to the property passed to USB in 1995, the delay being caused by Terra–Tech's intervening bankruptcy proceedings. By that time Terra–Tech had received final municipal subdivision approval for a portion of the property designated as Section 1 and consisting of seventeen residential lots plus two open space lots. Indeed, homes had been built and sold.

USB sought an extension from the Corps for the prior approvals granted to Terra–Tech but was informed that as of March 1994 jurisdiction over the regulation of the property had passed to the State. *See* 33 *U.S.C.* § 1344(g); *N.J.S.A.* 13:9B–27.

USB contacted the DEP and in an October 20, 1995 letter inquired what relief might be available now that DEP had assumed the regulatory functions. The DEP informed USB that it was no longer exempt from the FWPA and further development of the tract would require permits. *See generally MCG Assocs. v. DEP,* 278 *N.J.Super.* 108, 111–118, 650 *A.2d* 797 (App.Div.1994). An exception to the state permit requirements existed for upland buffer areas adjoining wetlands, i.e., transition areas, because Terra–Tech had received federal exemptions prior to the passage of the FWPA. *Ibid.*

At some point, helonias bullatta, or "swamp pink," had been discovered on the property. This vegetation is listed on both federal and state endangered species lists. A 1986 review of the property by the Corps had failed to disclose the presence of swamp pink.

In 1996 Richard Kropp, Director of the Land Use Regulation Program within the DEP, wrote a letter to the Director of the Nature Conservancy regarding the Conservancy's "possible interest" in the Tanglewood property because it contained a significant population of swamp pink. In part, Kropp said that "[t]he project cannot proceed due to the extent of disturbance a housing project would have on the wetlands, which cover the majority of the site." A copy of the letter went to a vice-president at USB. The record reflects no response to that letter or any follow-up by DEP.

Later in 1996, USB filed an Individual Permit Application (IPA) seeking to build on four lots in Section 1. In a three-page letter DEP requested additional information, including a better description of activities proposed, practicable alternatives, efforts made to minimize the impact on wetlands, and any information demonstrating extraordinary hardship if the permit were to be denied. USB provided some, but not all, of the requested information. In

November 1996 USB sought to expand its IPA to include twelve acres from Section 2. The DEP responded that such an amendment required notification to certain individuals and a permit fee of $11,400 "or we will not be able to process this request." The penultimate sentence in DEP's letter to USB was "[t]he Department will not review the request for amendment until these items are submitted but will issue a decision on the original application within the timeframes set forth by the Rules." USB did not pay the additional fees and the amendment was not considered.

In February 1997 the IPA for Section 1 was denied for lack of adequate documentation showing that the proposed project minimized impacts on wetlands. Under separate cover, however, Kropp wrote to USB suggesting that it seek two general permits for an upland portion of the Section 1 area under discussion. USB did so, and permits were granted for development of two houses on the Section 1 land and allowing "disturbance" of 7,300 square feet of wetlands.

In April 1997 USB sought a declaratory ruling from DEP "that there is no set of circumstances upon which the department would issue an individual wetland permit for the filling of 12 acres of wetlands and the construction of 35 homes in Section Two." DEP apparently did not respond. We note that pursuant to *N.J.S.A.* 52:14B–8, issuance of a declaratory ruling by an agency is discretionary.

USB's refusal to submit a permit application for Section 2 or to pay the requested fees was followed in 1998 by USB's initial inverse condemnation complaint. That complaint was dismissed without prejudice although the reasons therefor are not apparent from the present record.

In December 1997, in anticipation of its inverse condemnation action, USB formed a wholly-owned Pennsylvania subsidiary known as Terra Land Holding Company and transferred to it the title to the Tanglewood property. At the time of transfer, local property taxes were unpaid and the Borough of Gibbsboro had initiated *in rem* foreclosure proceedings. In March 2001 a final

judgment of foreclosure was entered on the property against Terra Land Holding. In May 2001 USB refiled its claim for inverse condemnation. The DEP responded by filing a motion to dismiss in lieu of answer which was ultimately treated as a motion for summary judgment because consideration was given to proofs beyond the pleadings. *R.* 4:6–2.

As indicated, the trial court dismissed plaintiff's complaint upon a determination that USB had failed to exhaust its administrative remedies. In essence, its claim had not ripened. We agree, although a more accurate factual statement would be that USB failed to initiate the formal administrative process.

First, there is no merit to USB's claim that the matter was not appropriate for summary judgment because discovery had not been taken. It is true that normally summary judgment should not be granted when discovery is incomplete. *Oslacky v. Borough of River Edge,* 319 *N.J.Super.* 79, 87, 724 *A.*2d 876 (App.Div.1999). It is also true, however, that if the summary judgment turns on a question of law, or if further factual development is unnecessary in light of the issues presented, then summary judgment need not be delayed. *See* Pressler, *Current N.J. Court Rules,* comment on *R.* 4:46–2 (2003); *see, e.g., Spaulding Composites Co. v. Liberty Mut. Ins. Co.,* 346 *N.J.Super.* 167, 173, 787 *A.*2d 238 (App.Div.2001), *rev'd on other grounds,* 176 *N.J.* 25, 819 *A.*2d 410 (2003); *Demas v. Nat'l Westminster Bank,* 313 *N.J.Super.* 47, 712 *A.*2d 693 (App.Div.1998), *certif. denied,* 161 *N.J.* 151, 735 *A.*2d 575 (1999) (plaintiff's allegations, even if true, did not state a cause of action). Here, the State brought a motion to dismiss based essentially on a claim that plaintiff had no standing to bring the action because it had failed to pursue the available administrative procedures thereby preventing a claim for inverse condemnation from ripening. In light of this claim, the record presented was sufficient to allow disposition on summary judgment. In our view, summary judgment was properly granted to the DEP. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

USB essentially claims that it had no need to file an actual permit application or pay the requested permit fees because the result was a foregone conclusion and the doctrine of futility allowed it to truncate the administrative process and proceed directly to court litigation. We disagree. Whatever the parameters of the so-called doctrine of futility as an exception to the doctrine of exhaustion of administrative remedies, that exception does not come into play before an applicant for administrative permission even files the request, at least not where the agency has some discretion to grant that request. If an agency cannot provide relief or conclusively resolve the issues, then perhaps resort to the courts becomes appropriate before exhaustion of the administrative process. *Abbott v. Burke*, 100 *N.J.* 269, 298, 495 *A.*2d 376 (1985). Preliminary statements from administrative officials, however, even if appearing conclusive, are just that— preliminary. In the present context, a landowner must give the land-use authority an opportunity to exercise its discretion. *Palazzolo v. Rhode Island*, 533 *U.S.* 606, 620, 121 *S.Ct.* 2448, 2459, 150 *L. Ed.*2d 592, 609 (2001). That discretion can only be properly exercised when the proposed land use is adequately defined and the permissible uses are evaluated.

*N.J.S.A.* 13:9B–22 provides:

a. Any person having a recorded interest in land affected by a freshwater wetlands permit issued, modified or denied pursuant to the provision of this act may file an action in a court of competent jurisdiction to determine if the issuance, modification or denial of the freshwater wetlands permit constitutes a taking of property without just compensation.

b. If the court determines that the issuance, modification, or denial of a freshwater wetlands permit by the department pursuant to this act constitutes a taking of property without just compensation, the court shall give the department the option of compensating the property owner for the full amount of the lost value, condemning the affected property pursuant to the provisions of the "Eminent Domain Act of 1971," P.L.1971, c. 361 (C. 20:3–1 et seq.), or modifying its action or inaction concerning the property so as to minimize the detrimental effect to the value of the property.

Although we have previously indicated that the ameliorative provisions of 22b can be triggered by a determination of the DEP, as well as by a determination of a court, *East Cape May Assocs. v.*

*DEP*, 300 *N.J.Super.* 325, 341, 693 *A.*2d 114 (App.Div.1997) (*East Cape May* I), here, DEP was deprived of the opportunity to exercise its discretion under 22b or, indeed, to exercise the discretion that it demonstrated in relation to property in Section 1. USB never told DEP what specifically was proposed for Section 2. While a full scale development may not have been possible, perhaps a smaller project was feasible through some combination of upland use and limited filling of wetlands. Of course, we will never know because USB did not even enter the permitting process when it decided to give up all hope. Yet, as noted, in Section 1 DEP had shown a flexibility that might have augured a similar approach to Section 2.

In the analogous context of an inverse condemnation action against DEP alleging a temporary taking, we said that requiring a permit does not constitute a taking and, consequently, there was no taking until plaintiff "had pursued the available regulatory process to its conclusion." *Griffith v. DEP*, 340 *N.J.Super.* 596, 611, 775 *A.*2d 54 (App.Div.), *certif. denied,* 170 *N.J.* 85, 784 *A.*2d 718 (2001), *cert. denied,* 534 *U.S.* 1161, 122 *S.Ct.* 1171, 152 *L. Ed.*2d 115 (2002). We also emphasized the need to allow DEP the opportunity to ameliorate. *Id.* at 608–609, 775 *A.*2d 54. We cited with approval *MHF Holding Co. v. DEP*, 314 *N.J.Super.* 87, 713 *A.*2d 1096 (Law Div.1997). There, the landowners had sought to fill in portions of wetlands and engaged in a pre-application conference with a DEP official. They were told that any IPA would likely be denied. The landowner subsequently abandoned the permit process and filed an inverse condemnation action against DEP. Plaintiff contended that further pursuit of the administrative process would have been futile. Judge Payne, then sitting in the Law Division, granted summary judgment to DEP noting that plaintiff's claim was not ripe.

A requirement that a person obtain a permit before engaging in certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit

is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

[*Id.* at 97, 713 *A.*2d 1096 (quoting *United States v. Riverside Bayview Homes, Inc.,* 474 *U.S.* 121, 126–127, 106 *S.Ct.* 455, 459, 88 *L. Ed.*2d 419, 426 (1985)).]

Nor can USB avail itself of the argument that DEP could not have utilized 22b amelioration because DEP had not promulgated regulations allowing waiver or relaxation of FWPA. *See East Cape May Assocs. v. DEP,* 343 *N.J.Super.* 110, 777 *A.*2d 1015 (App.Div.), *certif. denied,* 170 *N.J.* 211, 785 *A.*2d 439 (2001) (*East Cape May* II). USB had accepted the accommodation offered by DEP on a portion of Section 1 and we have no way of knowing if a similar accommodation was available on Section 2. Moreover, the law in this area was not clarified until *East Cape May* II. We are not prepared to say that any prior application of 22b was vitiated by that decision. Additionally, the question of the legality of DEP "modifying its action or inaction concerning the property," does not arise until the court or DEP determines that the "issuance, modification, or denial of a freshwater wetlands permit by the department" pursuant to the FWPA constitutes a taking without just compensation. *N.J.S.A.* 13:9B–22b. USB prevented that pre-qualifying determination from occurring when it decided not to seek a permit. The fact remains that USB's inverse condemnation claim never ripened. It cannot improve its position by arguing that any amelioration that DEP might have offered would have been *ultra vires* if USB had actually applied for a permit.

We also note that 22b speaks of compensation to "the property owner" or the exercise of eminent domain. The failure of plaintiff, and subsequently its wholly-owned subsidiary Terra Holding Company, to pay taxes on the property had the practical consequence of removing DEP's option to exercise the power of eminent domain. That power is not dependent upon promulgation of waiver regulations. The power of eminent domain, once granted, is then defined and detailed by the Eminent Domain Act of 1971, *N.J.S.A.* 20:3–1 to –50.

We need not address the trial court's additional reason for denying plaintiff's motion for reconsideration—i.e., it was no long-

er the record title holder. *N.J.S.A.* 13:9B–22a allows a "person having a recorded interest in land" to "file an action" for the taking of property without just compensation. Plaintiff, through its own neglect or willful determination, was not a person with an interest in the property when the second inverse condemnation action was filed. By that time the municipality had foreclosed and a final judgment of foreclosure had been entered, cutting off all right of redemption. Plaintiff points to various court decisions from other jurisdictions, both federal and state, that stand for or certainly can be read as standing for the proposition that an inverse condemnation claim arises upon the taking and any subsequent change in title to the property does not vitiate the claim made by the title holder of record at the time of the taking. *See, e.g., Danforth v. United States,* 308 *U.S.* 271, 283–284, 60 *S.Ct.* 231, 236, 84 *L.Ed.* 240 (1939); *Brooks Inv. Co. v. City of Bloomington,* 305 *Minn.* 305, 232 *N.W.*2d 911, 918 (1975). The apparent requirement of *N.J.S.A.* 13:9B–22a that an inverse condemnation action be brought by a person having a recorded interest in the land is arguably in conflict with these out-of-state decisions and the concomitant constitutional ramifications. We need not reach this issue because plaintiff's lack of title was not the reason its complaint was dismissed. At most that was a supporting rationale mentioned by the trial judge in denying the motion for reconsideration. The issue was not developed in the trial court and, in our view, is not adequately briefed in this court. Moreover, resolution of the issue in favor of plaintiff would not alter our decision.

Summary judgment in favor of the DEP is affirmed.