**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0860-22

ERIC GERSTMANN, JANINE
LUPPINO, and RONALD LUPPINO,

     Plaintiffs-Appellants,

and

ALI VEDARARZ, SHIRIN VEDARARZ,
ROSALINDA PALAD, CYNTHIA
AGNESE, ROEL PEREZ, YURIDIA
PENA, CAROL VILLAVICENCIO, and
MONICA TOGARU,

     Plaintiffs,

v.

EXECUTIVE HOUSE CONDOMINIUM
ASSOCIATION, INC., EXECUTIVE
HOUSE CONDOMINIUM BOARD OF
DIRECTORS, MARLENE
COSTAGLIOLA, JIM O'CONNOR,
IRA GOODMAN, KAREN ANDERSON,
NANCY WYMER, ALTICE USA,
d/b/a CABLEVISION SYSTEMS
CORPORATION, and OPTIMUM,

     Defendants-Respondents.

_____

Submitted January 10, 2024 – Decided January 17, 2025

Before Judges Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000003-22.

Jared M. Lans & Associates, attorneys for appellants (Jared M. Lans and Nicholas G. Gallinger, on the briefs).

Kirmser, Lamastra, Cunningham & Skinner, attorneys for respondents Executive House Condominium Association, Inc., Executive House Condominium Board of Directors, Marlene Costagliola, Jim O'Connor, Ira Goodman, Karen Anderson and Nancy Wymer (Timothy P. Malacrida, of counsel and on the brief).

Lester Schwab Katz & Dwyer, LLP, attorneys for respondent Altice USA d/b/a Cablevision Systems Corporation and Optimum (Alfredo Javier Alvarado, on the brief).

The opinion of the court was delivered by

GUMMER, J.A.D.

In this condominium-association dispute, plaintiffs Eric Gerstmann, Janine Luppino, and Ronald Luppino challenged the authority of the condominium's association and board of directors to enter into bulk-billing agreements with a cable-television provider. They appeal from two summary-

judgment orders entered in defendants' favor. Having conducted a de novo review, we affirm.

## I.

We draw these facts from the summary-judgment record, "view[ing] the evidence in the light most favorable to [plaintiffs,] the non-moving part[ies]." Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 71 (2024) (first alteration in original) (quoting Qian v. Toll Bros., Inc., 223 N.J. 124, 134-35 (2015)).

The Executive House Condominium is a multi-unit building located at 301 Beech Street in Hackensack. It consists of 127 residential units and four commercial units. The Executive House Condominium Association, Inc. (Association) is governed by its Board of Directors. Defendants Marlene Costagliola, James O'Connor, Ira Goodman, Nancy Wymer, and Karen Anderson became Board members in 2007, 2015, 2011, 2017, and 2016, respectively, and were Board members when plaintiffs filed this lawsuit. We refer to the Association, the Board, and the Board members collectively as the Executive House defendants.

Under the Association's Articles of Incorporation, the Association is permitted to exercise powers and perform duties as set forth under the

A-0860-22

condominium Master Deed and the Association's By-Laws (collectively the Governing Documents) and granted by statute. According to the By-Laws, the Association was "formed to serve as means through which the condominium unit owners . . . may take action with regard to the administration, management, repair and operation of the Property, in accordance with the provisions of a master deed . . . ."

Article IV, Section 2 of the By-Laws outlines the Board's powers and duties and states:

> The Board . . . shall have the powers and duties necessary for the administration of the affairs of the Association and may do all such acts and things, except as by law or by the Master Deed or by these By-Laws, may not be delegated to the Board . . . by Unit Owners. Such powers and duties of the Board . . . shall include but shall not be limited to the following:
>
> (a) The operation, care, upkeep, repair and replacement of the Common Elements and services and personal property of the Association, if any, together with the right to use all funds collected by the Association to effectuate the foregoing.
>
> (b) Determination of the Common Expenses required for the affairs and duties of the Association
>
> . . . .
> The Board . . . shall, prior to the beginning of each fiscal year of the Association, prepare a budget which shall determine the amount of common charges payable by each Unit to meet the Common Expenses of

4

the Association . . . . The Board . . . shall allocate and assess such charges among the Unit Owners according to and in the percentage of their respective ownership of Common Elements as set forth in the Master Deed. Unit Owner shall be advised of the amount of the Common Expenses payable by each of them and these charges shall be paid to the Association in twelve (12) equal monthly installments on the 1st day of each month of the fiscal year in advance at the office of the Association. A statement of the aforesaid yearly charges shall be mailed to each Unit Owner at the commencement of each fiscal year and no further billing by the Association shall be required.

. . . .

(c) Collection of the Common Expenses and assessments from the Unit Owners together with any costs and expenses of collection thereof.

. . . .

(s) To have and to exercise any and all powers, rights and privileges which a corporation organized under the nonprofit Corporation Law of the State of New Jersey by law may now or hereafter have or exercise.

Paragraph (b) of Section 2 includes the following limitation of the Board's authority:

Anything in these By-Laws or elsewhere to the contrary notwithstanding, the Board . . . shall not have the authority, except in the case of an extreme emergency, without the consent of the Unit Owners holding majority of the shares in the Common Elements to expend in excess of $5,000, on any item of expense

5

in any year in which it is not specified or if specified, over the amount indicated for such item in the aforesaid budget for such year.

Under the Master Deed, the Association is "comprised exclusively of Unit Owners to effect the management, maintenance, repair and replacement of the Property pursuant to the [New Jersey Condominium] Act [(N.J.S.A. 46:8B-1 to -38) (the Act)], this Master Deed and the 'By-Laws.'" Paragraph 27 of the Master Deed, which is entitled "Ratification, Confirmation and Approval of Agreements," provides, among other things, that:

> The purchase of a Unit, and the acceptance of a deed therefor by any party shall constitute the ratification, confirmation and approval by such purchaser, his heir, legal representative, successors and assigns of the propriety and legality of said agreement or said agreements, or any other agreements authorized and permitted by the Act, this Master Deed and the By-Laws.

The Master Deed defines "Common Elements" as "all parts of the Property other than the Units, including the items set forth in the Condominium Act, excluding the Unit or Units for janitor and/or superintendent." Pursuant to the Master Deed, each unit owner is required to pay "Common Expenses," meaning the owner's "proportionate share of all the expenses of maintenance, repair, replacement, administration and operation of the Common Elements." A unit owner's "proportionate share" of the Common Expenses is "the same as the

6

proportionate, undivided interest of the Unit Owner in the Common Elements as set forth in" the Master Deed.  Regarding utilities, paragraph 15 of the Master Deed provides:  "Each Unit Owner shall pay for his own telephone and cable television and other utilities which are separately metered or billed to each user by the respective utility company.  Utilities which are not separately metered or billed shall be treated as part of the Common Expense charges."

On February 27, 2008, the Association held an open session.  The minutes of that meeting contained the following entry:

> Bulk Cable TV
> A survey was delivered to every unit requesting interest in adding a service provider for Cable TV. Management stated the survey had a positive response and a representative will be in the lobby on Tuesday, March 4, 2008 to answer any questions concerning the Cable.  Once a final tally is established the Building will make a decision.  Two options were discussed. Several residents asked questions about Triple play.

Minutes from the April 23, 2008 open session stated the Board had "decided to proceed with the Bulk Cable TV."

On May 22, 2008, defendant Costagliola, who was then the president of the Board, signed an "Access Agreement" (Agreement) with a "Bulk Billing Rider" (Rider) with Cablevision of Oakland, LLC (the Company).  Under the Agreement, the Company agreed to "provide broadband communications

7

services . . . to the Premises by placing, maintaining, affixing, and attaching cables, wires, equipment, molding and appurtenant devices . . . ."

Under the Rider, the Company agreed "to provide the cable television services at the level currently known as iO Family, including one (1) box and converter and remote, to one (1) outlet, in each unit at the Premises." In return, the Association agreed to pay the Company "a monthly fee" of a certain amount "per residential unit . . . based on distribution of cable television services, including one (1) box and converter and remote to one (1) outlet in each of [the] . . . units." The Association agreed it would "not separately bill any occupant for the cable television services at the iO Family level, but [would] provide such cable television services as part of the . . . common charges or rent." "Individual occupants" could "obtain additional outlets or subscribe to certain additional programming or services offered by" the Company. Those "additional purchases [would] be billed by [the Company] directly to the occupant . . . ."

Pursuant to the Rider, the bulk-billing arrangement had an initial term of five years, which began on June 1, 2008. The Company and the Association renewed the Rider on April 3, 2012, for three additional years; on March 31, 2015, for five additional years; and on February 26, 2020, for five additional years. Under the 2020 Rider, the Association was liable for 100% of the monthly

A-0860-22

fee multiplied by the number of months left on the five-year extension in the event of an early termination of the Rider for any reason other than the Company's breach. The substantive provisions of the 2020 Rider for the most part tracked the provisions in previous Riders. Over time, the monthly fee has increased, and the specific cable packages provided have changed.

According to the Executive House defendants, twenty-five units in 2008 "had either basic cable at a rate below the bulk billing rate or no cable at all. Those units were not forced to get cable and were allowed to be exempt from the charge. As those units were transferred, they became subject to the bulk billing arrangement." The Executive House defendants assert unit purchasers "are advised before closing of the mandatory cable charge."

According to a "May 1, 2020 - April 30, 2021 Approved Budget," the Association included $75,866 for "Cable Service" in the 2020 to 2021 budget. According to a "May 1, 2021 - April 30, 2021 Approved Budget," the Association included $78,760 for "Cable Service" in the 2021 to 2022 budget. According to the Executive House defendants, the Association "has not spent more than $5,000 in unbudgeted funds on the Cable charge . . . ."

The Luppinos purchased Unit 12E in the Executive House Condominium in 2016. Gerstmann purchased Unit 9G in 2021. Plaintiffs and the Executive

A-0860-22

House defendants disagree about whether plaintiffs were advised before they purchased their units that unit owners were required to pay cable fees.

On January 3, 2022, Gerstmann and the Luppinos filed a verified complaint against "Altice USA d/b/a Cablevision Systems Corporation and Optimum" (Cablevision) and the Executive House defendants. Plaintiffs asserted the Board had entered into the Agreement and Rider "without proper authority" and sought a judgment declaring them "null and void," enjoining the Association and Board from invoicing plaintiffs for the Cablevision service charges, declaring those charges void, and requiring the Association and Board to remove those charges from plaintiffs' accounts and refund plaintiffs the Cablevision service charges they already had paid, if any. Plaintiffs also claimed the Board and its members had breached their fiduciary duties to plaintiffs by "violating the Association's Governing Documents, and New Jersey law." In the complaint, plaintiffs stated "Cablevision is a party [d]efendant by virtue of being a stakeholder as a party to the Agreement and a provider of cable television services to Unit Owners." They also acknowledged that "[t]he subject matter of the services provided pursuant to the Agreement are not Common Elements as defined in the Governing Documents."

Plaintiffs subsequently filed an amended complaint, naming eight additional unit owners as plaintiffs. None of those additional plaintiffs submitted a certification in opposition to defendants' summary-judgment motions, and none joined in this appeal.

In a March 14, 2022 case management order, the court ordered the parties to complete written discovery by June 1, 2022, depositions of parties and fact witnesses by September 3, 2022, and depositions of all expert witnesses by November 5, 2022, which was the discovery end date. The court later moved the deadline to complete written discovery to June 15, 2022. Cablevision provided responses to plaintiff's written discovery requests on June 24, 2022; the Executive House defendants provided plaintiffs with their responses on June 27, 2022. During a June 27, 2022 case management conference, the court gave plaintiffs additional to time to serve their discovery-request responses.

On July 29, 2022, the Executive House defendants moved for summary judgment. On August 12, 2022, Cablevision moved for summary judgment, arguing no party had asserted a cognizable claim against it. On August 24, 2022, plaintiffs moved for an order compelling defendants to provide more specific answers to their interrogatories and requests for production of documents. Plaintiffs' counsel had sent letters to counsel for the Executive House defendants

11

and Cablevision's counsel on July 25, 2022, and August 1, 2022, respectively, seeking supplemental discovery responses.[1]  During an August 2, 2022 case management conference, the only outstanding discovery issue raised by plaintiffs' counsel was his access to discovery exchanged between defendants. He nevertheless asserted in certifications he submitted later that month in opposition to defendants' summary-judgment motions that "there remains significant outstanding discovery in this matter . . . ."  Weeks after the August 2, 2022 conference and after defendants had moved for summary judgment, plaintiffs issued deposition notices, scheduling the depositions after the court-imposed deadline of September 3, 2022.

The court heard argument and on October 6, 2022, issued a verbal decision and written orders granting defendants' motions and dismissing the claims against the Executive House defendants with prejudice and the complaint as to Cablevision without prejudice.  The court rejected plaintiffs' argument that the motions were premature, finding additional discovery would not enable a

---

[1]  In those letters, plaintiffs' counsel requested documents regarding an "accounting and analysis" of the "cost savings" obtained through the bulk-billing agreements, any communications between the Association and unit owners regarding the Agreement, the "Cable TV Survey" results, vote tallies of the Association's approval of the Agreement, any communications between Cablevision and unit owners, and information on other buildings with bulk-billing agreements with Cablevision.

A-0860-22

factfinder to resolve the dispute in plaintiffs' favor. The court granted Cablevision's motion, finding there was "no cognizable cause of action" against it and that no cause of action against Cablevision had been "pled or expressed." The court granted the Executive House defendants' motion, rejecting plaintiffs' lack-of-authority arguments and finding that pursuant to paragraph 27 of the Master Deed, plaintiffs' purchase of their units constituted their ratification of the bulk-billing agreements. As for plaintiffs' breach-of-fiduciary-duty claim, the court held it "ha[d] seen nothing in this case . . . to warrant trying the issue as to whether this somehow is fraudulent, self-dealing, or unconscionable." Having granted defendants' summary-judgment motions, the court denied plaintiff's discovery motion in an order from which plaintiffs did not appeal.

Plaintiffs Eric Gerstmann, Janine Luppino, and Ronald Luppino appeal from the summary-judgment orders. They argue material factual disputes exist, summary judgment was premature, Cablevision is an indispensable party against whom plaintiffs asserted a cognizable claim, the Executive House defendants lacked authority to enter into the bulk-billing agreements pursuant to the Governing Documents and statute, and the Board and its members breached their fiduciary duties to plaintiffs. Having conducted our own review of the

13

summary-judgment motions, we are unpersuaded by those arguments and affirm.

## II.

We review a grant of summary judgment de novo, using the same standard that governed the trial court's decision. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "genuine issues of material fact and . . . the moving party is entitled to summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c); see also Grande, 230 N.J. at 24. "We accord no special deference to the trial court's legal conclusions." Birmingham v. Travelers N.J. Ins. Co., 475 N.J. Super. 246, 255, (App. Div. 2023).

Like the trial court, we perceive no genuine issues of material fact that would call for the denial of defendants' motions and conclude the Executive

A-0860-22

House defendants were authorized to enter into the bulk-billing arrangements at issue in this case. "Under the Condominium Act, the association 'shall be responsible for the administration and management of the condominium . . . including but not limited to the conduct of all activities of common interest to the unit owners.'" Port Liberte Homeowners Ass'n, Inc. v. Sordoni Constr. Co., 393 N.J. Super. 492, 503 (App. Div. 2007) (quoting N.J.S.A. 46:8B-12); see also Siller v. Hartz Mountain Assocs., 93 N.J. 370, 375 (1983) ("The Act . . . provides that the condominium will be administered and managed by [its] association"). "Whether or not incorporated, the association shall be an entity which shall act through its officers and may enter into contracts, bring suit and be sued." Port Liberte, 393 N.J. Super. at 503 (quoting N.J.S.A. 46:8B-15(a)).

Under Article IV, Section 2 of the By-Laws, the Association's Board was given "the powers and duties necessary for the administration of the affairs of the Association and may do all such acts and things, except as by law or by the Master Deed or by these By-Laws, may not be delegated to the Board . . . by Unit Owners." (Emphasis added). We see nothing in the Governing Documents or the Act that prevents the Executive House defendants from entering into the Cablevision agreements.

Article IV, Section 2, paragraph (b) of the By-Laws requires the Board to "allocate and assess [Common Expenses] among the Unit Owners according to and in the percentage of their respective ownership of Common Elements." The Master Deed defines Common Expenses as "expenses of maintenance, repair, replacement, administration and operation of the Common Elements." As plaintiffs acknowledged in their pleadings, "[t]he subject matter of the services provided pursuant to the Agreement are not Common Elements as defined in the Governing Documents." We agree. Thus, the Board was not required to allocate the cost of the cable-television services based on the unit owner's percentage of ownership and was not prevented from entering into an agreement with charges incurred on a per-unit basis. And that's what happens under the agreements at issue. Cablevision bills for its services a monthly fee calculated "per residential unit." That arrangement is consistent with the utilities provision set forth in paragraph 15 of the Master Deed.

Pursuant to paragraph (b) of Section 2 of Article IV of the By-Laws, the Board cannot "except in the case of an extreme emergency, without the consent of the [majority of] Unit Owners . . . expend in excess of $5,000, on any item of expense in any year in which it is not specified or if specified, over the amount indicated for such item in the aforesaid budget for such year." Nothing in the

A-0860-22

record indicates the Board violated that provision. In discovery, the Executive House defendants produced budgets issued during the term of the latest renewal period; they contained specific entries for cable expenses. And in interrogatory responses, defendants advised the Association "has not spent more than $5,000 in unbudgeted funds on the Cable charge . . . ." Plaintiffs have not demonstrated the existence of a genuine issue of material fact as to defendants' compliance with that provision of the By-Laws.

Paragraph 27 of the Master Deed provides that plaintiffs' purchase of their units and acceptance of their deeds "constitute[d] the ratification, confirmation and approval by [them] . . . of the propriety and legality of . . . any other agreements authorized and permitted by the Act, this Master Deed and the By-Laws." When plaintiffs purchased their units, in 2016 and 2021 respectively, the Association already had entered into the Agreement and the Rider. Thus, pursuant to paragraph 27, plaintiffs' purchase of their units constituted their approval of the propriety and legality of those agreements. Plaintiffs contend the Executive House defendants acted in a discriminatory manner in not applying the cable charges to every unit owner. But the only unit owners who are not required to pay the cable charges had purchased their units before the Association entered into the Agreement and Rider. Consequently, the

17 A-0860-22

ratification provision set forth in paragraph 27 does not apply to those unit owners.

Plaintiffs fault the Executive House defendants for purportedly not complying with Article V, Section 9 of the By-Laws, which provides: "All agreements, contracts, deeds, leases, checks and other instruments of the Association shall be executed by any two officers of the Association or by such other person or persons as may be designated by the Board of Directors." Only defendant Costagliola, as Board president, signed the Agreement and Rider and subsequent extensions. The Executive House defendants assert she could be the sole signatory as a "person . . . designated by the Board." Whether she was a "person . . . designated by the Board" or whether another board member should have signed the agreements is of no import. It is undisputed the Board had decided to enter into those agreements.

Plaintiffs contend the Executive House defendants violated N.J.S.A. 46:8B-15(d) by entering into the Agreement and Rider. That statutory provision describes the procedure a condominium association must follow when "acquir[ing] or enter[ing] into agreements whereby it acquires leaseholds, memberships or other possessory or use interests in lands or facilities including, but not limited to country clubs, golf courses, marinas and other recreational

facilities." N.J.S.A. 46:8B-15(d). Under its plain terms, that statute does not apply to the agreements at issue in this case. Rivera v. Union Cnty. Prosecutor's Off., 250 N.J. 124, 141 (2022) (finding that when interpreting a statute, courts look to its actual language and give words their generally accepted meaning).

"[T]o establish a claim for breach of fiduciary duty, a plaintiff must show: (1) the defendant had a duty to the plaintiff; (2) the duty was breached; (3) injury to the plaintiff occurred as a result of the breach; and (4) the defendant caused that injury." Namerow v. PediatriCare Assocs., LLC, 461 N.J. Super. 133, 146 (Ch. Div. 2018); see also F.G. v. MacDonell, 150 N.J. 550, 563-64 (1997). Plaintiffs based their breach-of-fiduciary-duty cause of action on their claim the Board and its members had violated the Governing Documents and New Jersey law by entering into the Agreement and Rider. Having agreed with the trial court that defendants did not violate the Governing Documents or applicable law, we also agree that defendants were entitled to summary judgment on plaintiffs' breach-of-fiduciary-duty cause of action.

Plaintiffs assert the court acted prematurely in granting defendants' motions, contending discovery was not complete. A summary-judgment motion "is not premature merely because discovery has not been completed . . . ." Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015). "Purely legal

19

questions, such as the interpretation of . . . contracts, are questions of law particularly suited for summary judgment." Ibid.; see also United Sav. Bank v. N.J. Dep't of Env't Prot., 360 N.J. Super. 520, 525 (App. Div. 2003) ("if the summary judgment turns on a question of law, or if further factual development is unnecessary in light of the issues presented, then summary judgment need not be delayed").

To defeat a summary-judgment motion based on a claim of outstanding discovery, a plaintiff must be "able to 'demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action.'" Badiali, 220 N.J. at 555 (quoting Wellington v. Est. of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003)) (internal quotation marks omitted); see also Minoia v. Kushner, 365 N.J. Super. 304, 307 (App. Div. 2004) ("While we are aware that ordinarily decision on a summary judgment should be withheld until completion of discovery, nevertheless, discovery need not be undertaken or completed if it will patently not change the outcome."). In a case that turns largely on the interpretation of the Governing Documents, plaintiffs have failed to meet that standard and have failed to demonstrate the discovery they suggest would supply any missing elements of their cause of action or alter the outcome.

Plaintiffs include in their merits brief an argument based on the Cable Television Act, N.J.S.A. 48:5A-1 to -64. Plaintiffs did not cite or rely on that statute in their pleadings, and their counsel did not make any argument based on it during oral argument before the trial court. Because that issue was not "properly presented to the trial court," we decline to consider it. J.K. v. N.J. State Parole Bd., 247 N.J. 120, 138 n.6 (2021) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)); see also Alloco v. Ocean Beach & Bay Club, 456 N.J. Super. 124, 145 (App. Div. 2018) (applying "well-settled" principle that appellate court will not consider an issue that was not raised before the trial court).

In granting Cablevision's motion, the trial court correctly concluded plaintiffs had not pleaded a cause of action against Cablevision. As plaintiffs stated in their pleadings, "Cablevision is a party [d]efendant by virtue of being a stakeholder as a party to the Agreement and a provider of cable television services to Unit Owners." Plaintiffs do not allege Cablevision engaged in any wrongdoing. They do not claim Cablevision breached any contracts with or duties owed to them or in any way caused the alleged breaches and violations of the Executive House defendants. They do not seek any damages from Cablevision. "A pleading should be dismissed if it states no basis for relief and

discovery would not provide one." Rezem Fam. Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 113 (App. Div. 2011).

Instead, plaintiffs argue Cablevision should remain in the case as an indispensable party. "Whether a party is indispensable is fact sensitive." Int'l Brotherhood of Elec. Workers Local 400 v. Borough of Tinton Falls, 468 N.J. Super. 214, 225 (App. Div. 2021). "[A] party is not truly indispensable unless he has an interest inevitably involved in the subject matter before the court and a judgment cannot justly be made between the litigants without either adjudging or necessarily affecting the absentee's interests." Ibid. (quoting Toll Bros., Inc. v. Twp. of W. Windsor, 334 N.J. Super. 77, 90-91 (App. Div. 2000)).

"[A]bsence of an indispensable party does not deprive the court of jurisdiction to adjudicate the issues among the parties who were joined." Toll Bros., 334 N.J. Super. at 91. And this court will not remand a case based on the absence of an indispensable party when doing so would be "fruitless." Int'l Brotherhood, 468 N.J. Super. at 226. The trial court found a claim by Cablevision "would only arise if [the] Executive House [defendants] were to lose" and granted Cablevision's motion when it granted the Executive House defendants' motion. Under those circumstances, we perceive no error in the

A-0860-22

court's decision to grant Cablevision's motion and, accordingly, affirm the court's order.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

23